UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

JAMIE BECKER,                          )
                                       )
                    Plaintiff,         )
                                       )
        v.                             )          3:12-cv-182-WGH-TWP
                                       )
CITY OF EVANSVILLE and                 )
ZACHARY ELFREICH, individually and     )
as an Officer of the Evansville Police )
Department,                            )
                                       )
                    Defendants.        )


**ENTRY ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**Table of Contents**

I.  Summary Judgment Standard...................................................................1

II. Facts and Procedural History..................................................................2

        A. Becker's Arrest...........................................................................3

                1. Elfreich's Approach.............................................................4

                2. Elfreich's Uses of Force......................................................7

        B. Earlier Proceedings....................................................................9

III. Elfreich is entitled to partial summary judgment on Becker's Section 1983
     excessive force claims. ...................................................................10

        A. A reasonable jury could find that Elfreich's uses of force were
           objectively unreasonable. ........................................................10

                1. Rule of Law: Whether a use of force is reasonable depends on all
                   of the circumstances known to the officer at the time of the
                   arrest. ...............................................................................10

                        a. Crime of Suspicion......................................................13

b. Threat to Officers' or Others' Safety..............................14

c. Attempts to Resist or Flee from Arrest..........................18

d. Issuance of a Warning................................................20

e. Officer's Exercise of Control over the Dog....................22

f. Duration of the Bite and Hold.....................................23

g. Reasonableness of Deploying a Dog to Bite and Hold.....26

2. Application: The circumstances would justify a jury in finding Elfreich's uses of force objectively unreasonable. ..................27

a. A reasonable jury could find that Elfreich correctly suspected Becker of a violent crime. ...........................28

b. A reasonable jury could find that Elfreich had minimal reason (and, after seeing Becker on the stairs, no reason) to perceive that Becker posed a safety threat. ..............29

c. A reasonable jury could find that Elfreich had no reason to believe that Becker was hiding and that Becker never attempted to resist or flee from arrest. ........................32

d. A reasonable jury could find that Elfreich issued no warning before unleashing Axel. .................................34

e. A reasonable jury could find that Elfreich exercised no control over Axel from the time he unleashed Axel until he ordered Axel to release Becker's leg roughly one minute later. .....................................................................35

f. A reasonable jury could find that Elfreich allowed Axel to bite Becker for longer than was necessary to complete the arrest. ..................................................................37

g. A reasonable jury could find that, given the availability of other tactics, Elfreich acted unreasonably by unleashing Axel with instructions to bite and hold Becker. ............38

3. Conclusion: A reasonable jury could conclude that Elfreich applied excessive force when he unleashed Axel with instructions to bite and hold Becker, when he yanked Becker down the stairs, and when he allowed Axel to continue biting Becker's leg for nearly a minute after Becker surrendered. ....39

B. Elfreich is entitled to qualified immunity for his decision to unleash Axel with instructions to bite and hold Becker—but not for his subsequent actions. ....................................................................41

    1. A police officer's exertions of force are protected by qualified immunity unless pre-existing law has clearly established them as unconstitutional. ..........................................................43

        a. The right in question must be cast in the light of the specific facts of the case. .............................................44

        b. A judicial precedent finding a constitutional violation on similar facts is helpful—but not essential—to establishing that the law clearly has established the right in question. .................................................................45

    2. The law has not clearly established that an officer offends the Fourth Amendment by unleashing a dog to bite and hold a suspect under the circumstances present here. ....................47

    3. Clearly established law would have notified any competent officer that the Fourth Amendment would prohibit pulling an arrestee face-first down the stairs after a dog had bitten his leg and he had surrendered. ......................................................50

    4. Clearly established law also would have notified any competent officer that the Fourth Amendment would prohibit allowing a police dog to continue biting an unarmed, nonresisting arrestee's leg for nearly a minute after he had surrendered. ...53

C. Conclusion: Elfreich is entitled to partial summary judgment on Counts IV and VI of the Amended Complaint. ................................56

IV. The City of Evansville is entitled to partial summary judgment on Becker's Section 1983 excessive force claims. ......................................................57

A. Becker may prevail on his *Monell* claims by proving that the EPD's policies reflected "deliberate indifference" toward the Fourth Amendment and constituted the "moving force" behind Elfreich's unconstitutional conduct. ..........................................................57

B. A reasonable jury could find that the EPD's policies reflected "deliberate indifference" toward the Fourth Amendment and caused some—but not all—of Elfreich's conduct. .......................................61

1. A reasonable jury could find that the City caused some of Becker's injuries by failing to explain in SOP 359.00 or elsewhere when officers must terminate their exertions of force against arrestees. .................................................62

2. A reasonable jury could find that the City caused some of Becker's injuries by failing to require in SOP 359.03 or elsewhere that officers constantly remain in position to exercise complete control over their dogs. ..........................................65

3. Becker has not identified another basis for deliberate indifference in SOP 359.03. .................................................68

V. The Defendants are not entitled to summary judgment on Becker's battery or negligence claims. ...............................................................................69

A. Because a reasonable jury could find Elfreich's conduct "willful and wanton," the ITCA does not protect Elfreich. ..................................70

B. The ITCA does not exempt officers or municipalities from liability for negligently imposed excessive force. ..............................................72

C. Because a reasonable jury could find Elfreich's conduct objectively unreasonable, the Defendants are not entitled to summary judgment on grounds of reasonableness. ......................................................73

VI. Conclusion............................................................................................74

## Opinion

This matter is before me, William G. Hussmann, Jr., United States Magistrate Judge, on the Defendants' Motion for Summary Judgment ([Filing No. 80](#)), the parties' consent ([Filing No. 8](#); [Filing No. 9](#)), and Judge Pratt's Order of Reference ([Filing No. 11](#)). The motion is fully briefed. (*See* [Filing No. 81](#); [Filing No. 83](#); [Filing No. 85](#); [Filing No. 93](#); [Filing No. 98](#); [Filing No. 102](#).) Having considered the motion, the parties' filings, and relevant law, and being duly advised, I hereby **GRANT** the motion in part and **DENY** it in part.

## I.    Summary Judgment Standard

A court must grant summary judgment on a claim or defense "where the admissible evidence shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law." *[Bunn v. Khoury Enters., Inc.](#)*, 753 F.3d 676, 681 (7th Cir. 2014); [Fed. R. Civ. P. 56(a)](#). A fact is "material" if it "might affect the outcome of the suit under the governing law." *[Anderson v. Liberty Lobby, Inc.](#)*, 477 U.S. 242, 248 (1986). And a factual dispute is "genuine"—precluding summary judgment—"only when the evidence could support a reasonable jury's verdict for the non-moving party." *[Crawford v. Countrywide Home Loans, Inc.](#)*, 647 F.3d 642, 650 (7th Cir. 2011).

The movant "bears an initial burden of proving there is 'no material question of fact with respect to an essential element of the non-moving party's case.'" *[MMG Fin. Corp. v. Midwest Amusements Park, LLC](#)*, 630 F.3d 651, 657 (7th Cir. 2011) (quoting *[Delta Consulting Grp., Inc. v. R. Randle Constr., Inc.](#)*, 554 F.3d 1133, 1137 (7th Cir. 2009)). That burden is formidable, and courts

should exercise caution in granting summary judgment.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 255.  If the movant succeeds, the nonmovant then must present "evidence raising a genuine issue of material fact." *MMG Fin. Corp.*, 630 F.3d at 657.  The nonmovant need not "clearly prove" his case to avoid summary judgment; he can survive by raising evidence of specific facts that would "permit" a jury to decide in his favor.  *Williams v. City of Chicago*, 733 F.3d 749, 760 (7th Cir. 2013).

"At summary judgment a court may not assess the credibility of witnesses, choose between competing inferences or balance the relative weight of conflicting evidence; it must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party." *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 255).  Effectively, the movant asks "the court to apply the law to only the [nonmovant]'s version" of the events.  *See Norris v. Bain*, No. 1:04-cv-1545-DFH-TAB, 2006 WL 753131, at *1 (S.D. Ind. Mar. 21, 2006).

## II.    Facts and Procedural History

Except where I have noted otherwise, the following description of the facts reflects Becker's account and resolves conflicts and reasonable inferences in his favor.  The Defendants may ultimately prove this account untrue.  But, at this stage in the proceedings, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 255.

## A. Becker's Arrest

On March 11, 2011, a Vanderburgh County judge issued a warrant for Jamie Becker's arrest on allegations that, three weeks earlier, he held a knife to his brother-in-law's neck and threatened to kill him.  (Filing No. 81-1 at ECF pp. 3–4.)  At that time, the Evansville Police Department ("EPD") at least suspected Becker of also having threatened his then-roommates with a "decorative spear," a sword, and nunchucks in October of 2010.  (*See id.* at ECF pp. 1–2.)  The Defendants assert that Becker had been "arrested and charged" in response to the October incident as of March 11, 2011, but the only evidence they have tendered to support that assertion is a probable cause affidavit.  (*See* Filing No. 81 at ¶ 1; Filing No. 81-1 at ECF pp. 1–2.)  Because I must resolve conflicts and reasonable inferences in Becker's favor, I assume that the EPD did not attempt to arrest Becker as a result of the October incident before obtaining the March warrant.

In March of 2011, Becker lived in Evansville with his mother, Brinda, and his girlfriend, Holly Overfield.  (Filing No. 81-9 at ECF p. 2:1–4.)  Three uniformed EPD officers went to Brinda Becker's house early in the evening of March 11 to execute the arrest warrant.  (Filing No. 83 at ECF p. 4.)  Because the warrant accused Becker of a violent crime, and because they knew Becker had been accused of violently threatening his roommates in October of 2010, the EPD dispatched Officer Zachary Elfreich—a police dog handler—to assist them in arresting Becker.  (*See id.* at ECF p. 5.)

The officers did not activate the lights or sirens on their patrol cars as they approached the residence.  (Filing No. 81-7 at ECF p. 14:10–13.)  Elfreich guarded the house's back door while his three compatriots approached the front.  (Id. at ECF pp. 13:25–14:5, 14:16–25.)  There, Elfreich encountered Brian Mortis leaving the house.  (Id. at ECF p. 17:3–10; Filing No. 83 at ECF p. 5.)  Mortis told Elfreich that Becker was inside along with his mother and her sister, Delores Pfister.  (Filing No. 81-7 at ECF p. 17:11–17.)

Using his police radio, one of Elfreich's comrades relayed that Brinda Becker greeted them at the door and then shouted upstairs to Becker that police were there to arrest him.  (Filing No. 81-7 at ECF pp. 16:12–22, 19:9–21.)  After Becker did not present himself, the officers secured Brinda Becker and Pfister on the front porch, called Elfreich to the front of the house, and prepared for him to use his dog, Axel, to roust Becker and complete the arrest.  (Id. at ECF pp. 18:14–19:6, 19:22–20:2, 20:20–21:5.)

### 1. Elfreich's Approach

Like all of the EPD's dogs, Axel is trained in the "bite-and-hold" technique.  (Filing No. 93-3 at ECF pp. 5:20–25, 6:10–14.)  On Elfreich's command, Axel will search for a person, bite the first person he finds, and hold that person with his teeth until Elfreich commands him to release.  (Id. at ECF p. 5:20–25; Filing No. 81-7 at ECF p. 10:14–16.)  Elfreich has admitted that, once commanded to find a suspect, Axel will bite and hold the first person he finds—even if the person is not the target of the search, and even if the person has surrendered.  (Filing No. 81-7 at ECF p. 10:2–16.)

The parties agree that Elfreich is capable of controlling Axel through voice commands even when Axel is off his leash and beyond Elfreich's physical control. (Filing No. 81 at ¶ 42; Filing No. 85 at ¶ 39; Filing No. 81-7 at ECF p. 4:1–7.) The parties also agree that Axel is not only capable of inflicting "lethal force" but that "there is a probability" of him doing so. (Filing No. 81-7 at ECF p. 11:5–12; Filing No. 85 at ¶ 41.)

Elfreich has testified that he entered the front door to the home with Axel on his leash, shut the front door, and yelled a loud, clear verbal warning: "Police department K-9, come out now or I will release my dog and you will get bit." (Filing No. 81-7 at ECF p. 21:8–14.) Elfreich listened for movement or a verbal response and heard nothing. (Id. at ECF p. 21:19–21.) So he repeated his warning, listened again, and heard nothing again. (Id. at ECF p. 21:21–23.) Approximately 30 seconds after issuing the first warning, Elfreich unleashed Axel and instructed him to find Becker, knowing he would bite and hold the first person he encountered, even if that person had surrendered. (Id. at ECF pp. 21:25–22:4, 22:22–23:13.)

Becker has testified that, when the police arrived, he was asleep with Overfield in his upstairs bedroom.[1] He heard his mother's announcement that police were there to arrest him, looked outside, saw police vehicles, and

---

[1] Neither party has filed page 8 of Becker's deposition, which appears to contain Becker's account of what happened when the police arrived. To the extent my construction here is not directly supported by Becker's testimony, I find that it is a reasonable inference from the facts in the record. Moreover, it is supported by Overfield's deposition testimony. (See Filing No. 81-8 at ECF p. 3:6–18.) In any event, I do not perceive any dispute between the parties as to whether Becker was asleep when the officers arrived.

assumed the officers had come to arrest him for threatening his brother-in-law. (Filing No. 93-1 at ECF pp. 2:19–23, 4:18–20.)  Becker replied that he was dressing and would be down momentarily.  (*Id.* at ECF p. 5:21–24.)  He dressed, asked Overfield to come with him, exited the bedroom, walked through an upstairs living room area, and began to descend the stairs.  (Filing No. 81-13 at ECF p. 3:1–5; Filing No. 93-1 at ECF pp. 4:18–5:3.)

Becker disputes Elfreich's claim that he issued a warning.  According to Becker, his bedroom sat at the front of the house and featured a floor vent (really, "a hole in the floor with a grate over it") that would have enabled him to hear any warning given from inside the front door, but he heard nothing except his mother's announcement.  (Filing No. 93-1 at ECF p. 6:12–24.)  Becker's account is supported by his mother's testimony that she was standing on the front porch when Elfreich entered the home and that he never announced the presence of a police dog.  (Filing No. 93-2 at ECF pp. 4:8–14, 7:2–24.)[2]

---

[2] A court adjudicating a motion for summary judgment may only consider evidence that would be admissible or usable at trial.  *See Aguilera v. Cook Cnty. Police & Corrections Merit Bd.*, 760 F.2d 844, 849 (7th Cir. 1985).  Therefore, I cannot consider the police report in which a supervising officer states that:

- both Brinda Becker and Pfister reported that Elfreich never issued a verbal warning;

- two EPD officers reported that Elfreich issued warnings and that they could hear them from the front porch; and

- one of those officers reported that the third was able to hear the warnings from the back yard.

(Filing No. 83 at ECF pp. 7–9.)  As they are communicated through the police report, these statements are inadmissible hearsay for the purpose of determining whether Elfreich actually issued a warning.  *See* Fed. R. Evid. 801(c), 802.  If this matter proceeds to trial, these witnesses may testify to their own observations.

The parties also disagree as to how much time elapsed between Brinda Becker's announcement that police were at the house and Becker's exit from the upstairs bedroom. The Defendants do not offer a precise time but argue that Becker was "hiding" and "concealing" himself in an effort to "delay" his arrest.[3] (*E.g.*, Filing No. 81 at ¶ 44, ECF pp. 14, 16.) Becker maintains that he dressed quickly and that no more than two minutes elapsed between Brinda Becker's announcement and his descent. (Filing No. 93-1 at ECF p. 20:16–21.)

### 2. Elfreich's Uses of Force

Once unleashed, Axel ran from the front door to the back of the house and began up the back steps. (Filing No. 83 at ECF p. 5.) Meanwhile, Becker (with Overfield following) had begun to descend the stairs, holding his hands on top of his head so the police would know he had surrendered and was not a threat to their safety. (Filing No. 93-1 at ECF pp. 6:25–7:6.) After walking a few steps, Becker reached a landing, where he felt Axel brush his left leg and then bite his left ankle. (*Id.* at ECF pp. 7:7–12, 7:23–8:1.)

Becker shouted, "Call the dog off. I'm coming towards you." (Filing No. 93-1 at ECF p. 8:4.) Elfreich had lost sight of Axel but ran to the steps, following Becker's voice. (Filing No. 81-7 at ECF pp. 25:20–26:13.) Elfreich saw that Axel had bitten Becker's leg but did not command him to release Becker. (*Id.* at ECF p. 25:5–8.)

---

[3] Importantly, the Defendants have not supported their allegations of hiding or concealment with any evidence except Elfreich's deposition testimony, which reflects only his own perception of Becker's conduct. (*See, e.g.*, Filing No. 81-7 at ECF p. 28:3–11.)

After he was bitten, Becker remained standing with his hands on his head. (Filing No. 93-1 at ECF p. 9:8–12.) Elfreich has testified that he ordered Becker to show his hands and get on the floor. (Filing No. 81-7 at ECF p. 26:14–16.) Elfreich next grabbed Becker by the front of his shirt collar and yanked him down the remaining stairs. (Filing No. 93-1 at ECF pp. 8:2–22, 9:1–2.) Becker's eyeglasses fell off his face, and he landed hard on his chest and head. (Id. at ECF p. 9:3–14.)

Axel—who had lost his grip when Elfreich pulled Becker down the stairs—bit Becker's left calf and shook his head violently. (Filing No. 81-13 at ECF p. 3:11–16; Filing No. 93-1 at ECF pp. 9:25–10:7.) Although he experienced intense pain, Becker lay still on the ground with his hands behind his back. (Filing No. 93-1 at ECF p. 11:5–24.) Becker maintains that he did nothing to resist Elfreich or Axel, and the Defendants have presented no contrary evidence. (Id. at ECF pp. 20:24–21:6.) Becker and Overfield screamed, but Elfreich placed his knee in Becker's back, handcuffed him, and only then ordered Axel to release his grip.[4] (Id. at ECF pp. 9:25–10:7, 17:20–18:10.) Axel complied. (Id. at ECF p. 10:5–7.)

---

[4] The Defendants argue that it was reasonable for Elfreich to handcuff Becker before ordering Axel to release because, although he expected to find Becker in the house alone, Overfield also was with him on the stairs and increased the potential for an ambush. (See Filing No. 81 at ECF p. 17.) I will address this argument later in this Entry, but I pause here to note that none of Elfreich's statements in the record indicate that he perceived that Overfield presented a safety threat or that her presence enhanced Becker's potential to harm him or Axel. (See Filing No. 83 at ECF pp. 5–6; Filing No. 81-7.)

Becker alleges that Axel bit him for about a minute. ([Filing No. 58-1 at ¶ 22](#).) The Defendants have not offered a different estimate of the bite's duration; their only evidence of timing is Officer's Elfreich's testimony that it took him only two or three seconds to run across the first floor of the house after he first heard Becker scream. ([Filing No. 81-7 at ECF p. 25:20–26:7](#).)

**B. Earlier Proceedings**

Becker initiated this lawsuit, raising a series of claims against Elfreich and the City of Evansville. In short, he has alleged that Elfreich's conduct amounts to battery or negligence under Indiana law and that the City also should be liable as Elfreich's employer. Becker also has alleged that Elfreich violated his Fourth Amendment right to be free from unreasonable seizures and that the City also bears responsibility because its deficient policies authorized Elfreich's unconstitutional conduct.

Becker filed an Amended Complaint ([Filing No. 58-1](#)) after the Court partially granted the Defendants' first Motion for Judgment on the Pleadings (*see* [Filing No. 56](#)). The Court then granted portions of the Defendants' motion for judgment on the Amended Complaint (*see* [Filing No. 76](#); [Filing No. 79](#)), leaving the following claims viable by the time the Defendants filed this motion:

- Elfreich is liable under [42 U.S.C § 1983](#) for using excessive force in violation of Becker's Fourth Amendment rights (Counts IV and VI).

- The City is liable under Section 1983 for implementing police department policies that caused Elfreich to use excessive force against Becker (Counts V and VI).

- Elfreich's applications of excessive force constituted battery (Count I) or negligence (Count III) under Indiana law.

9

- The City is liable as Elfreich's employer for his acts of battery (Count I) or negligence (Count III).

## III. Elfreich is entitled to partial summary judgment on Becker's Section 1983 excessive force claims.

Section 1983 creates a cause of action for people whose constitutional rights have been violated by a person exercising the authority of a state or municipal government. 42 U.S.C. § 1983. In Counts IV and VI of the Amended Complaint, Becker alleges that Elfreich used such unnecessary force while arresting Becker that he performed an unreasonable seizure forbidden by the Fourth Amendment. The Defendants ask the Court to grant Elfreich summary judgment either because his behavior was protected either by the Fourth Amendment's allowance for reasonable seizures or by the doctrine of qualified immunity. I conclude that a reasonable jury could find all of Elfreich's actions unreasonable but that qualified immunity entitles him to partial summary judgment on this claim.

### A. A reasonable jury could find that Elfreich's uses of force were objectively unreasonable.

The Defendants begin their motion by asking the Court to find that Elfreich's conduct was reasonable as a matter of law and therefore compliant with the Fourth Amendment. (*See* Filing No. 81 at ECF pp. 12–18.) Resolving factual disputes in Becker's favor, I cannot adopt that conclusion.

#### 1. Rule of Law: Whether a use of force is reasonable depends on all of the circumstances known to the officer at the time of the arrest.

The right "to be free of excessive force during an arrest has long been established . . . ." *Titran v. Ackman*, 893 F.2d 145, 146 (7th Cir. 1990). "[E]ven

when an officer has probable cause to arrest, the Fourth Amendment prohibits him from employing greater force than [is] reasonably necessary to make the arrest." *Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706, 724 (7th Cir. 2013) (internal quotations omitted).  The ultimate question, then, "is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989).  And, "[b]ecause questions of reasonableness are not well-suited to precise legal determination, the propriety of a particular use of force is generally an issue for the jury." *Chew v. Gates*, 27 F.3d 1432, 1440 (9th Cir. 1994).  *Accord.* *Phelps v. City of Indianapolis*, No. 1:02-cv-1912-DFH-VSS, 2004 WL 1146489, at *9 (S.D. Ind. May 10, 2004) (noting that reasonableness "is often a question for a jury, though in some cases the issue can be decided as a matter of law").

The reasonableness inquiry offers some—but not complete—deference to law enforcement officers' perceptions and judgments.  "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham,* 490 U.S. at 396.  But an officer's perceptions justify his use of force only to the extent his perceptions are reasonable.  *E.g.*, *Baird v. Renbarger*, 576 F.3d 340, 344–45 (7th Cir. 2009) ("Renbarger's subjective concerns do not transform this setting into one calling for such a heavy-handed use of force.").  Therefore, "[t]he reasonableness of the force used depends on the totality of the facts and

circumstances known to the officer at the time the force is applied." *Abbott,*
*705 F.3d at 724*.

Similarly, the Supreme Court has demanded that reviewing courts allow
"for the fact that police officers are often forced to make split-second
judgments—in circumstances that are tense, uncertain, and rapidly evolving—
about the amount of force that is necessary in a particular situation." *Graham,*
*490 U.S. at 396–97*.  But this important consideration does not give officers a
free pass in every arrest.  As the Ninth Circuit has noted, not all situations
evolve rapidly or require split-second judgment.  *See Chew,* 27 F.3d at 1443
("This was not an occasion on which the police were forced to make 'split-
second judgments' in circumstances that were 'rapidly evolving.'") (quoting
*Graham,* 490 U.S. at 397).  And, as the Seventh Circuit has explained, even a
rapidly evolving situation cannot justify a use of force that is objectively
unreasonable.  *See Abbott,* 705 F.3d at 731 ("Because the *Graham* balance tips
so heavily in Cindy's favor, we do not think that the rapidly unfolding nature of
these relatively innocuous events tips the balance the other way.").

At minimum, a court considering the reasonableness of a use of force
must weigh three factors:

    (a) the severity of the criminal activity that prompted the officer's
        action;

    (b) whether the scenario presented an immediate threat to the
        safety of the officer, innocent bystanders, or the public; and

    (c) whether the subject of the arrest actively resisted or attempted
        to flee from or evade arrest.

[Graham, 490 U.S. at 396](); [Abbott, 705 F.3d at 724]().  Where the use of force in question is the use of a police dog, courts often weigh four additional factors:

> (d) whether the officer warned the subject that he would deploy the dog[5];
>
> (e) the degree of control the officer maintained over the dog[6];
>
> (f) whether the officer terminated the dog bite within a reasonable amount of time[7]; and
>
> (g) whether alternative tactics reasonably were available[8].

### a. Crime of Suspicion

Police may be justified in using greater force to arrest a person suspected of a serious crime than they would be justified in using to arrest a person suspected of a petty offense.  But the Ninth Circuit has remarked that distinguishing between serious and nonserious crimes based on felony and misdemeanor classifications can be a misguided approach and has suggested that perhaps the better distinction is between violent and nonviolent offenses. [Chew, 27 F.3d 1432, 1442 (9th Cir. 1994)]() ("A wide variety of crimes, many of them nonviolent, are classified as felonies.").  And in [Alicea v. Thomas](), the

---

[5] *E.g.*, [Kuha v. City of Minnetonka, 365 F.3d 590, 598–99 (8th Cir. 2003)](), *abrogated in part on other grounds by* [Szabla v. City of Brooklyn Park, Minn., 486 F.3d 385, 395–96 (8th Cir. 2007)]() (en banc); [Carlson v. Mordt, No. 00 C 50252, 2002 WL 1160115, at *4 (N.D. Ill. May 29, 2002)]().

[6] *E.g.*, [McKay v. City of Hayward, 949 F. Supp. 2d 971, 981 (N.D. Cal. 2013)](); [Dawe v. Rogers, No. 8:09-cv-620-T-30-AEP, 2010 WL 271435, at *5 (M.D. Fla. Jan. 15, 2010)]().

[7] *E.g.*, [Edwards v. Shanley, 666 F.3d 1289, 1295–96 (11th Cir. 2012)](); [Otero v. Indico, No. 8:10-CV-1849-T-27TGW, 2012 WL 4478999, at *5 (M.D. Fla. Sept. 28, 2012)]().

[8] *E.g.*, [Olvera v. City of Modesto, --- F. Supp. 2d ---, No. 1:11-CV-00540, 2014 WL 3858362, at *13–14 (E.D. Cal. Aug. 6, 2014)]() (slip opinion); [Rodriguez v. Tushnet, No. 1:11-CV-01371-LJO-DLB, 2012 WL 996552, at *6 (E.D. Cal. Mar. 23, 2012)]().

Northern District of Indiana recently suggested that temporal proximity of the arrest to the criminal act also should be a critical consideration. No. 2:11-CV-445-TLS, 2014 WL 4311079, at *6 (N.D. Ind. Sept. 2, 2014). This is because a suspect caught redhanded—even for a nonviolent offense—has a heightened incentive to flee or resist arrest. *Id.*

### b. Threat to Officers' or Others' Safety

"Force is reasonable only when exercised in proportion to the threat posed . . . ." *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 863 (7th Cir. 2010). Accordingly, the extent to which a suspect presents a threat to officers' or others' safety is a critical issue raising numerous considerations. Three are particularly relevant in this case.

First, an officer may more reasonably perceive a safety threat when she confronts a crime (or flight from a crime) in progress than when she investigates or responds to an act committed in the past. In *Baird*, the Seventh Circuit contrasted officers' use of force while investigating the suspected alteration of a vehicle identification number against the immediate apprehension of an armed robbery suspect. *See* 576 F.3d at 344, 346. Likewise, in *Holmes v. Village of Hoffman Estates*, the Seventh Circuit implied there was no active threat to anyone's safety when officers confronted a man who was sitting peacefully in a parking lot but matched the description of a man suspected of committing a nearby robbery earlier that day. 511 F.3d 673, 686 (7th Cir. 2007) ("At that point, Teipel knew (or believed) only that Piatek was investigating Holmes in connection with recent robberies and that Holmes

had been a 'smart ass' to Piatek, not that Holmes had done or said anything manifesting resistance or the need for the officers to employ increased force."). *See also Alicea*, 2014 WL 4311079, at *6 (emphasizing the risks associated with confronting a crime in progress).

Second, and quite naturally, an officer can reasonably perceive a safety threat if she has specific grounds to believe her suspect is armed. Some courts have found that an officer cannot reasonably perceive a safety threat without specific information suggesting her suspect is armed. For example, in *Chew*, the Ninth Circuit found no "articulable basis for believing that" a suspect who fled from a traffic stop and hid for 90 minutes in a scrapyard was armed or presented an immediate safety threat. 27 F.3d at 1441–42.

Other courts have taken an opposite approach, essentially licensing officers to presume suspects are armed until they can confirm they are unarmed. In *Alicea*, for example, the court found that the absence of any indication that the plaintiff was unarmed supported the reasonableness of the officers' decision to unleash a police dog. 2014 WL 4311079 at *6.[9] "A responding police officer," the court explained,

---

[9] *Accord., e.g.*, *Otero v. Indico*, No. 8:10-CV-1849-T-27TGW, 2012 WL 4478999, at *4 (M.D. Fla. Sept. 28, 2012) (" . . . Deputy Indico could not see Plaintiff's hands, and did not know if Plaintiff was unarmed . . . ."); *Lowry v. City of San Diego*, No. 11-CV-946-MMA(WMC), 2013 WL 2396062, at *6 (S.D. Cal. May 31, 2013) ("They did not know whether the suspect was armed."); *Rodriguez v. Tushnet*, No. 1:11-CV-01371-LJO-DLB, 2012 WL 996552, at *5 (E.D. Cal. Mar. 23, 2012) ("Officer Tushnet was also aware that Mr. Rodriguez had not been searched for weapons."); *Baker v. Cohen*, No. 09-60103-CIV-JORDAN, 2010 WL 3385266, at *12 (S.D. Fla. Aug. 5, 2010) ("It is undisputed that . . . officers could not see Baker's hands and did not know if he was armed."), *report and recommendation adopted in relevant part*, 2010 WL 3385264 (Aug. 26, 2010); *Dawe v. Rogers*, No. 8:09-cv-620-T-30-AEP, 2010 WL 271435, at *5 (M.D.

15

> is "entitled to err on the side of caution when faced with an
> uncertain or threatening situation," and under the Plaintiff's
> version of the facts, the police officers had limited
> information about the nature of the Plaintiff and crime when
> responding to the scene and were entitled to err on the side
> of caution that the Plaintiff might be armed and dangerous.

*Id.* (internal quotation unattributed).  And, in *DeLuna v. City of Rockford*, the

Seventh Circuit found that an officer's decision to shoot at a suspect was

supported in part by the fact that he had been told the suspect "had a history

of violence" and "was known to both carry and sell weapons."  *See* 447 F.3d

1008, 1012 (7th Cir. 2006).

   With no precedent binding the Court on this issue, I embrace the Ninth

Circuit's approach in *Chew*.[10]  An officer should be able to articulate a rational

basis for believing that a suspect is armed before inflicting violence

commensurate with that belief.  If officers may treat all suspects as armed until

they confirm otherwise, the Fourth Amendment's protection against excessive

force is no protection at all.  This approach does not reflect indifference toward

---

Fla. Jan. 15, 2010) ("It is also undisputed that Rogers did not know whether the
suspect was armed . . . ."); *Kruse v. Jackson*, No. 05-CV-2123 JMR/FLN, 2006 WL
3758204, at *4 (D. Minn. Dec. 20, 2006) (" . . . until Officer Jackson had control of
both of plaintiff's hands, he could not be certain plaintiff was compliant and
unarmed."); *Ingram v. Pavlak*, No. Civ. 03-2531 (RHK/AJB), 2004 WL 1242761, at *4
(D. Minn. June 1, 2004) (" . . . neither Pavlak nor Wortman could discern whether
Ingram was armed . . . .").

[10] I do not read *DeLuna* as freeing officers to use force first and determine later
whether a suspect is armed.  There, the suspect's alleged history of owning and selling
weapons was only one factor justifying the officer's use of deadly force.  The court also
emphasized that the suspect disobeyed the officer's commands, behaved irrationally,
taunted the officer in a manner indicating he would become violent, and lunged at the
officer (possibly in an effort to take his gun) in the moments before being killed.  *See*
447 F.3d at 1012–13.

officers' safety.  Rather, it acknowledges that the *Graham* analysis defers only to reasonable safety concerns.

Finally, a suspect's surrender may figure into the calculus.  In *Graham*, the Supreme Court instructed judges to consider whether a suspect presents an "immediate" safety threat.  490 U.S. at 396.  And, in *Cyrus*, the Seventh Circuit cautioned that, "as the threat changes, so too should the degree of force."  624 F.3d at 863.

Some courts, however, have found officers reasonable in perceiving immediate safety threats even after their suspects have indicated their surrender.  In *Ingram v. Pavlak*, the court found that officers reasonably could send a dog into a closet to flush out a suspect because, although the suspect said he was surrendering, he continued to hide in the closet, and the officers could not predict what he might do.  No. Civ. 03-2531(RHK/AJB), 2004 WL 1242761, at *5 (D. Minn. June 1, 2004).  More broadly, the court in *Alicea* found that officers are not always required to accept verbal surrenders.  2014 WL 4311079 at *6.  The suspect, the court explained, "could have quickly changed his mind and the officer was not required to take his apparent surrender at face value."  *Id.*  "Not all surrenders," it continued, "are genuine . . . ."  *Id.*

I find myself unpersuaded by the suggestion that officers always may ignore pleas of surrender.  This Court is bound by *Cyrus*'s admonition that officers must adjust their force as safety threats wane, 624 F.3d at 863, and I cannot give that admonition effect without requiring officers to honor pleas of

surrender.  In a case like *Ingram*, where a suspect continues to resist arrest after pleading to surrender, a continued use of force may be reasonable.  *See* 2004 WL 1242761 at *5.  Absent specific cause for skepticism, however, a plea of surrender should affect the reasonableness determination.

### c. Attempts to Resist or Flee from Arrest

An officer may be justified in using heightened force when a suspect resists arrest by fighting back against the officer[11] or running away[12]. Heightened force may also be reasonable where a suspect disobeys an officer's commands or hides to avoid arrest, as the Defendants accuse Becker of doing here.

Even where a suspect does not forcibly resist arrest or flee from the scene, her failure to comply with officers' orders may render a use of force reasonable.  In *Lowry v. City of San Diego*, for example, the court found officers' release of a dog to bite and hold a suspect reasonable in part because the plaintiff did not obey officers' commands to reveal herself—even though she was asleep and did not hear the commands.  No. 11-CV-946-MMA(WMC), 2013 WL 2396062, at *6 (S.D. Cal. May 31, 2013).

---

[11] *E.g.*, *Abbott*, 705 F.3d at 727–28 (finding that officer acted reasonably by using Taser multiple times because arrestee continued to fight against officer—even after being handcuffed).

[12] *E.g.*, *Dawe v. Rogers*, No. 8:09-cv-620-T-30-AEP, 2010 WL 271435, at *5 (M.D. Fla. Jan. 15, 2010) (plaintiff jumped fence, ran into woods, and hid); *Johnson v. Scott* (*Johnson I*), No. 1:07-cv-155, 2008 WL 3874690, at *4, *8 (N.D. Ind. Aug. 14, 2008) (plaintiff led officer in high-speed automobile chase, then continued to run on foot after reaching roadblock), *aff'd*, 576 F.3d 658, 660–61 (7th Cir. 2009).

But every failure to comply with an officer's instructions does not necessarily justify a use of force—particularly where the officer's actions prevent the suspect from complying with his instructions. In *Cyrus*, the Seventh Circuit considered an excessive force claim raised by two parents whose son died after being shocked by a police Taser. 624 F.3d at 858. The officer shocked the decedent twice, at which point the decedent rolled down the driveway where the incident occurred and landed face down with his hands under his stomach. *Id.* at 859–860. Because the decedent would not put his hands behind his back to be handcuffed, the officer shocked the decedent several more times before discovering he had stopped breathing. *Id.* at 860. In reversing the district court's grant of summary judgment, the Court of Appeals contemplated that the initial shocks may have caused the decedent to roll down the driveway involuntarily and left him unable to move his hands. *Id.* at 863.

Courts routinely hold that police may reasonably unleash dogs to locate, bite, and hold suspects who are hiding. When a suspect is hiding, officers may reasonably fear that he has gained a position of advantage and is waiting to spring an ambush. *See, e.g.*, *Carlson v. Mordt*, No. 00 C 50252, 2002 WL 1160115, at *4 (N.D. Ill. May 29, 2002) (suspect hiding in his attic).[13] One court has gone so far as to find that it was reasonable for officers to unleash a

---

[13] *See also, e.g.*, *Rodriguez v. Tushnet*, No. 1:11-CV-01371-LJO-DLB, 2012 WL 996552, at *5–6 (E.D. Cal. Mar. 23, 2012) (suspect hiding in residential area); *Dunn v. Nance*, No. CV-08-23-S-BLW, 2009 WL 1956429, at *6 (D. Idaho July 6, 2009) (suspect hiding in bushes); *Ingram*, 2004 WL 1242761, at *4–5 (suspect hiding in furnace closet in his basement).

dog to locate, bite, and hold a suspect who had fled arrest and who they suspected—but did not know—was hiding. *Fallis v. Sasaki*, No. C09-5730BHS, 2011 WL 111724, at *10, *11 (W.D. Wash. Jan. 13, 2011).

Notably, though, the Ninth Circuit took a different approach in *Chew*, finding that hiding alone does not justify officers in perceiving a safety threat. 27 F.3d at 1441–42. "The defendants," the court explained, "do not suggest that Chew engaged in any threatening behavior during this time, or that he did anything other than hide quietly. In light of these facts, a rational jury could easily find that Chew posed no *immediate* safety threat to anyone." *Id.* at 1442 (emphasis in original).

On this issue, I take something of a middle ground. As the *Carlson* court noted, a hiding suspect presents a serious and palpable safety threat. But I reiterate that a safety threat justifies force only when the officer's perception of the threat and her response to it are reasonable. *See Baird*, 576 F.3d at 344–45; *Abbott*, 705 F.3d at 724. Accordingly, if an officer exerts force on the belief that a suspect is hiding and presents an immediate safety threat, the officer should be able to articulate a reasonable basis for that belief.

### d. Issuance of a Warning

A jury may reasonably conclude that an officer applies excessive force by unleashing a dog to bite and hold a suspect without first offering a warning and an opportunity to surrender. *E.g., Kuha v. City of Minnetonka*, 365 F.3d 590, 598 (8th Cir. 2003), *abrogated in part on other grounds by Szabla v. City of*

*Brooklyn Park, Minn.*, 486 F.3d 385, 395–96 (8th Cir. 2007) (en banc); *Brown v. Whitman*, 651 F. Supp. 2d 1216, 1226 (D. Colo. 2009) (collecting cases).

But no "precedent compels the conclusion that a verbal warning is mandatory in every case where a police dog is utilized." *Brown v. Whitman*, 651 F. Supp. 2d at 1226. In fact, some courts have explicitly identified situations in which the absence of a warning does not render release of a dog unreasonable. In *Dawe v. Rogers*, for example, the court found no warning necessary because the officer kept the dog leashed throughout the incident and used the dog only for the purpose of locating the plaintiff. No. 8:09-cv-620-T-30-AEP, 2010 WL 271435, at *5 (M.D. Fla. Jan. 15, 2010). In other cases, courts have found that it would be impractical or futile for officers to attempt to issue warnings to suspects who have fled or hidden. *See, e.g.*, *Johnson v. Scott* (*Johnson II*), 576 F.3d 658, 661 (7th Cir. 2009) ("'Scott had no real opportunity to [warn] given Johnson's head-long flight and surprising, last-second surrender.'") (quoting *Johnson v. Scott* (*Johnson I*), No. 1:07-cv-155, 2008 WL 3874690, at *7 (N.D. Ind. Aug. 14, 2008)); *Alicea*, 2014 WL 4311079, at *7 (excusing failure to warn because "the whereabouts of the Plaintiff were unknown"). Similarly, the *Fallis* court found that unleashing a dog without warning was reasonable in part because the officers might have compromised their position and endangered themselves by issuing a warning. 2011 WL 11724 at *10–11.

But in *Kuha*, the Eighth Circuit took a contrary approach. 365 F.3d at 599. While acknowledging that "officer safety is paramount," the court

disputed "that requiring a verbal warning will [always] put officers at increased risk." *Id.* The court conceded that "there may be exceptional cases where a warning is not feasible . . . ." *Id.* In general, though, it found that issuing warnings "would likely diminish the risk of confrontation by increasing the likelihood that a suspect will surrender." *Id.*

The Seventh Circuit has not addressed this issue, and I join the Eighth Circuit in finding that the absence of a warning ordinarily would justify a jury in finding excessive force where an officer unleashes a dog to bite and hold a suspect without offering a warning and an opportunity to surrender. *See Kuha,* 365 F.3d at 598. Officers may only use such force as is reasonably necessary to effect an arrest. *Abbott,* 705 F.3d at 724. It seems reasonable to expect officers to honor that standard by issuing a warning designed to avoid the drastic step of unleashing a dog that is all but guaranteed to injure someone. *See Kuha,* 365 F.3d at 599.

Where the parties dispute whether a warning is issued, the court should resolve that dispute in the plaintiff's favor for summary judgment purposes. A plaintiff who maintains he heard no warning cannot reasonably be asked "to 'prove a negative' by showing that no warning was given." *Grady v. Becker,* 907 F. Supp. 2d 975, 982 (D. Minn. 2012).

### e. Officer's Exercise of Control over the Dog

Whether a police dog is deployed reasonably depends in part on the level of control the officer maintains over the dog. In *McKay v. City of Hayward,* for example, the court denied summary judgment to an officer who lowered a dog

over a privacy fence and into the plaintiff's backyard with no officers in sight. 949 F. Supp. 2d 971, 981 (N.D. Cal. 2013). The court found a material dispute as to whether the dog was under the officer's supervision or control when it bit the plaintiff. Id. By the same token, maintaining heightened control over the dog can enhance an officer's reasonableness. For example, in Dawe, the court found the reasonableness of the officer's actions supported by the fact that he kept the dog leashed throughout the incident and promptly disengaged the dog once it pulled the plaintiff from the bushes where he had been hiding. 2010 WL 271435 at *5.

### f. Duration of the Bite and Hold

The Seventh Circuit counseled in Cyrus that, "as the threat changes, so too should the degree of force." 624 F.3d at 863. Therefore, even where deploying a dog to bite and hold a suspect is reasonable, an officer may use excessive force by allowing the dog to continue biting and holding a suspect who has ceased to pose a threat to fight or flee. For example, in Edwards v. Shanley, the Eleventh Circuit found that an officer reasonably used a police dog to track and subdue a fleeing suspect. 666 F.3d 1289, 1295 (11th Cir. 2012). But he "used unreasonable force when he subjected Edwards to five to seven minutes of dog attack, while Edwards was pleading to surrender and [the officer] was in a position to immediately effect Edwards's arrest." Id. at 1296. Other courts have found the same issue raised by shorter attacks. See, e.g., Campbell v. City of Springboro, Ohio (Campbell I), 788 F. Supp. 2d 637, 671–72

(S.D. Ohio 2011) (questioning reasonableness of allowing dog to attack plaintiff for up to 45 seconds), *aff'd Campbell II,* 700 F.3d 779, 787 (6th Cir. 2012).[14]

Some courts have found that an officer reasonably could allow a dog to continue to bite a suspect for as long as it takes to handcuff the suspect or confirm that the suspect is unarmed. For example, in *Pace v. City of Palmetto*, the court found that officers reasonably allowed a dog to bite and hold a suspect for roughly 90 seconds. 489 F. Supp. 2d 1325, 1333–34 (M.D. Fla. 2007). The suspect had led the officers on a chase through a swamp. *Id.* at 1328–29. The court reasoned that the officers needed some time to catch up with the suspect and that it was reasonable to spend 20 or 30 seconds verifying that the suspect's hands (which were underwater) were empty and that the suspect was unlikely to continue his flight. *Id.* at 1333–34.

Similarly, in *Kruse v. Jackson*, the court found that it was not objectively unreasonable for an officer to handcuff a fleeing suspect before calling off the dog. No. 05-CV-2123-JMR/FLN, 2006 WL 3758204, at *4–5. The plaintiff tried to outrun the dog and disobeyed the officer's orders to place his hands on his head. *Id.* at *4. The court reasoned that, "until Officer Jackson had control of both of plaintiff's hands, he could not be certain plaintiff was compliant and unarmed." *Id.* at *5.

---

[14] *See also, e.g., Baker v. Cohen,* No. 09-60103-CIV-JORDAN, 2010 WL 3385266, at *13–14 (S.D. Fla. Aug. 5, 2010) (questioning reasonableness of allowing dog to bite plaintiff for several minutes until paramedics arrived on the scene), *report and recommendation adopted in relevant part,* 2010 WL 3385264 (Aug. 26, 2010); *Dunn v. Nance,* No. CV-08-23-S-BLW, 2009 WL 1956429, at *7 (D. Idaho July 6, 2009) (questioning reasonableness of allowing dog to bite suspect for up to a minute after he surrendered).

But other courts have disapproved of allowing dogs to continue biting after the suspect has been subdued—even if the officer has not yet handcuffed the suspect or confirmed that he is unarmed.  In *Campbell I*, for example, the court found that a jury could find it was unreasonable to allow the dog to attack the plaintiff for up to 45 seconds even though he had disobeyed the officer's orders to show his hands.  788 F. Supp. 2d at 671–72.  And, in *Dunn v. Nance*, the court concluded that a reasonable jury could find that an officer unreasonably allowed a dog to continue biting the plaintiff until he was handcuffed.  No. C-08-23-S-BLW, 2009 WL 1956429, at *2, *7 (D. Idaho July 6, 2009).  The bite lasted "for more than one minute, even as Plaintiff was lying flat on the ground, not resisting, and with his arms outstretched in full view of the officers."  *Id.* at *7.

In the end, removing a dog as quickly as the circumstances allow always weighs in favor of finding reasonableness.  In *Otero v. Indico*, for example, the court explained that the reasonableness of officers' use of a dog to bite and hold a suspect was buoyed by the fact that they called the dog off as soon as it removed the plaintiff from the bushes where he was hiding—even before they handcuffed him.  No. 8:10-CV-1849-T-27TGW, 2012 WL 4478999, at *5 (M.D. Fla. Sept. 28, 2012).  The court in *Carlson* exhibited similar reasoning.  There, officers used a dog to chase the plaintiff from the attic where he had been hiding.  2002 WL 1160115 at *2.  After they called off the dog and removed the plaintiff, an officer accidentally dropped the dog out of the attic, and it bit the plaintiff for another 30–70 seconds.  *Id.* at *2, *6.  The court found that the

second bite was not an unreasonable use of force because, among other factors, the handler called off the dog as quickly as he could climb out of the attic himself. *Id.* at *6.

### g. Reasonableness of Deploying a Dog to Bite and Hold

The defendants correctly note that "[t]here is no per se rule that any particular use of force, including the use of a police dog, is unreasonable." *Williams v. Hainje*, No. 4:06-CV-121-JVB, 2008 WL 4298499, at *6 (N.D. Ind. Jan. 17, 2008), *adopted as modified on other grounds*, 583 F. Supp. 2d 967 (N.D. Ind. 2008). But, as Judge Hamilton has noted, "the use of a dog trained to 'bite and hold' a subject is likely to result in at least some injuries to a subject even if the subject submits immediately after the first physical contact with the dog." *Mason v. Hamilton Cnty.*, 13 F. Supp. 2d 829, 833 (S.D. Ind. 1998).

So, the availability of other means of apprehension presents a relevant consideration in the *Graham* analysis. *See Fallis*, 2011 WL 11724, at *10. In *Olvera v. City of Modesto*, for example, the court found a material dispute as to whether the officers reasonably used a dog to bite and hold the plaintiff. --- F. Supp. 2d ---, No. 1:11-CV-00540, 2014 WL 3858362, at *14, (E.D. Cal. Aug. 6, 2014) (slip opinion). In that case, the plaintiff presented expert testimony suggesting that less forceful tactics would have been effective, and the officers failed to call for back-up or investigate further to determine whether using the dog would have been reasonable. *Id.* at *13–14. Likewise, in *Rodriguez v. Tushnet*, the court found the reasonableness of the officers' actions enhanced

by their attempts to subdue their suspect through less forceful means before unleashing a dog. No: 1:11-CV-01371-LJO-DLB, 2012 WL 996552, at *6 (E.D. Cal. Mar. 23, 2012).

### 2. Application: The circumstances would justify a jury in finding Elfreich's uses of force objectively unreasonable.

As I set out to apply the law of excessive force to the facts presented here, I begin with three points of order. First and foremost, the parties have presented different versions of the facts, and the Defendants' arguments rest heavily on the factfinder accepting their account. As a matter of law, though, I must resolve factual discrepancies in Becker's favor as the non-movant. *Abdullahi*, 423 F.3d at 773.

Second, I am applying the law to three distinct uses of force—not just one. Where a single incident encompasses multiple forceful actions, courts commonly apply the *Graham* analysis to each discrete use of force. *See, e.g.*, *Edwards*, 666 F.3d 1289, 1295–96 (11th Cir. 2012); *Dunn*, 2009 WL 1956429, at *5–7; *Carlson*, 2002 WL 1160115, at *4–6. *Accord. Mitchell v. Krueger*, --- F. App'x ---, No. 14-1810, 2014 WL 5840734, at *2–3 (7th Cir. Nov. 12, 2014) (non-precedential order) (finding that a jury could not reasonably question officers' use of force to restrain a fighting prisoner but could question subsequent uses of force).

During the March 11 incident, Elfreich intentionally applied physical force restraining Becker's freedom of movement three times. First, Axel bit Becker on the left ankle after Elfreich unleashed him with instructions to bite and hold. Second, Elfreich grabbed Becker by the front of his shirt collar and

yanked him down the steps.[15]  Third, Elfreich placed his knee in Becker's back and allowed Axel to continue to bite and hold Becker's calf until Elfreich had handcuffed Becker.  Each use of force constitutes a "seizure" regulated by the Fourth Amendment, *see* *Abbott*, 705 F.3d at 719, so I will apply the *Graham* analysis to each.

Third, the law on this topic is voluminous and far-flung.  *Graham* requires courts to consider each excessive force claim by analyzing each of its individual circumstances.  490 U.S. at 396.  No single case includes all the circumstances at play here, and the cases that feature component circumstances present here come from diverse jurisdictions and have produced diverse conclusions.  When in doubt, I find myself guided by two overarching principles: first, the fundamental rule that force is reasonable only to the extent it is necessary to effect an arrest[16]; and, second, that reasonableness typically is a question best answered by a jury[17].

### a. A reasonable jury could find that Elfreich correctly suspected Becker of a violent crime.

The officers sought to arrest Becker for threatening his brother-in-law's life while holding a knife to his throat.  He was wanted for his alleged

---

[15] The Defendants state that "Becker does not claim or argue that Elfreich's actions in pulling Becker to the ground and handcuffing him constitute excessive force."  (*See* Filing No. 98 at ECF p. 3.)  I find that Becker has stated such a claim through his Complaint (Filing No. 58-1 at ¶ 21), his response to the Defendants' motion (Filing No. 85 at ¶¶ 11–13), and the evidence he has presented to support his claims (Filing No. 93-1 at ECF pp. 8:2–22–9:14, 17:20–18:10).

[16] *Abbott*, 705 F.3d at 724; *Cyrus*, 624 F.3d at 863.

[17] *See* *Chew*, 27 F.3d at 1440; *Phelps*, 2004 WL 1146489, at *9.

perpetration of an undeniably violent crime committed with a weapon. This factor weighs in the Defendants' favor with respect to each of the three uses of force.

### b. A reasonable jury could find that Elfreich had minimal reason (and, after seeing Becker on the stairs, no reason) to perceive that Becker posed a safety threat.

Accepting Becker's account of the events, I find that a jury would be justified in finding that he did not present an immediate threat to anyone's safety—or, at least, not such a threat as to warrant the force Elfreich used.

On the evidence before me, a jury reasonably could doubt whether Elfreich had any specific reason to believe that Becker was armed. The officers on the scene suspected Becker of having threatened his brother-in-law with a knife, and at least some EPD officers suspected him of having threatened his former roommates with other weapons.[18] But three weeks had passed since the most recent of those incidents occurred. The officers were not responding immediately to the scene of a crime reported in progress, where they would be likely to encounter Becker holding the same weapon he used to commit the action of which he was suspected. Rather, they showed up at his house three weeks later and found him asleep.

Of course, a jury might find that Elfreich reasonably feared that Becker would pick up a weapon after learning that police had come to arrest him.

---

[18] A supervising officer reported that he accompanied at least some of the officers executing the March warrant in responding to the October incident, suggesting that they knew firsthand that Becker had violent tendencies. (Filing No. 83 at ECF p. 9.) But their firsthand knowledge is not Elfreich's, and his knowledge and perspective are what matter.

But, as I explained in Section III(A)(1)(b) above, I hold that officers should be able to articulate some specific reason for thinking that a suspect is armed before visiting force upon him. *See Chew*, 27 F.3d at 1441–42.  The evidence here would allow a jury to reasonably question whether Elfreich could articulate such a reason.

A jury also could find that, even if Elfreich reasonably suspected that Becker was armed, that suspicion would have justified only the initial release of Axel to find Becker.  When Elfreich first laid eyes on Becker, his hands were on his head, demonstrating that he was not holding a weapon.  But Elfreich proceeded to yank Becker down the stairs, place his knee in Becker's back, and allow Axel to continue to bite Becker until Becker was handcuffed.  It does not appear that Elfreich suspected Becker of being armed after he first saw him, as no evidence in the record suggests that he searched Becker for weapons— either before or after he handcuffed Becker.

A jury also could doubt that Elfreich could reasonably have feared that Becker was likely to become violent.  By Becker's account, his mother told the officers that he was asleep upstairs, and she called upstairs to tell them they had come to arrest him.  Becker says he replied that he would dress and come downstairs and that he began his walk down the stairs—with his hands on his head[19]—within two minutes.  These facts are consistent with surrender and

---

[19] The Defendants argue that Becker's testimony that he descended the stairs peacefully is immaterial because he "did not communicate with anyone as he was walking down the backstairs." (*See* Filing No. 98 at ECF p.3.)  But Becker also has presented evidence showing that he stated he would be down quickly after dressing and that he behaved consistent with that message.  A reasonable jury therefore could

would justify a jury in questioning Elfreich's judgment that Becker presented an immediate threat to anyone's safety.

The Defendants, citing *Johnson II*, argue that Elfreich was not obligated to treat Becker as surrendered because "Elfreich had no idea how Becker was going to behave when he reached the landing." (*See* Filing No. 98 at ECF p. 4.) As the Defendants correctly note, the Seventh Circuit upheld summary judgment in *Johnson II* and applied the principle that officers need not take every "apparent surrender at face value," 576 F.3d at 660, but it operated on markedly different facts than apply here. Johnson—whom police pursued as a suspect immediately after receiving reports of a night club shooting—led the officer and his dog on a chase that began in a car and continued on foot. *Id.* at 659. By the time the officer exited his car and unleashed the dog, Johnson already had run off. *Id.* And, by the time Johnson stopped and said, "I give up," the dog had closed to within eight feet and could not be stopped. *Id.*

Different facts call for a different result here. A reasonable jury could find that, unlike Johnson, Becker made his surrender clear and gave Elfreich time to avoid excessive force by announcing that he would be down quickly after dressing and then promptly coming downstairs. The same jury could conclude that it was unreasonable for Elfreich to allow Axel to run ahead unleashed so soon after Becker's response and that it was particularly grievous

---

conclude that, within two minutes of Becker's response, Elfreich could not have developed a fear of danger that would have justified unleashing Axel.

for Elfreich to continue using force after seeing Becker—his weaponless hands and ensnared leg plainly visible—on the landing.

In sum, then, a reasonable jury could find that Elfreich had little reason to believe that Becker presented an immediate safety threat when he unleashed Axel with instructions to find, bite, and hold Becker. It also could find that Elfreich had even less reason to believe that Becker presented an immediate safety threat when he yanked Becker down the stairs. By that point, Elfreich could see that Becker was behaving consistent with his statements of surrender, that his hands were empty, and that his left leg was immobilized by Axel. Finally, a reasonable jury could find that Elfreich had minimal reason to believe Becker presented an immediate safety threat when he placed his knee in Becker's back and allowed Axel to continue biting Becker until Becker's hands were cuffed. Becker's weaponless hands were still, behind his back, and in full view; and he continued to act consistent with his statements of surrender.

By Becker's account, Elfreich elevated his force as the immediacy of any safety threat waned. Accordingly, this factor weighs heavily in Becker's favor with respect to all three uses of force.

### c. A reasonable jury could find that Elfreich had no reason to believe that Becker was hiding and that Becker never attempted to resist or flee from arrest.

Accepting Becker's version of the facts, a reasonable jury could conclude that it was unreasonable for Elfreich to perceive that Becker was hiding. The officers did not activate their lights or sirens as they approached the house, so

Becker had no reason to know they were present before his mother called for him.  Still, he responded promptly and came downstairs within two minutes.  A reasonable jury could find that two minutes is a modest amount of time for a person to wake up, dress, and walk downstairs.

Becker was not "hiding" just because he did not answer the door himself when the officers arrived.  The law did not require Becker to wait at the door for three weeks after allegedly confronting his brother-in-law in case the police might come by to arrest him.  Given his quick response, a reasonable jury could conclude that Elfreich had no rational grounds for perceiving that Becker was hiding.

A reasonable jury also could conclude that, even if Becker was hiding, that could only justify Elfreich's initial decision to unleash Axel.  Elfreich yanked Becker to the ground and allowed Axel to continue biting him after he was plainly visible, and no evidence suggests that Becker fought back against either Elfreich or Axel or otherwise sought to resist or evade arrest.  Becker maintains that he stood with his hands on his head before being pulled to the ground and then laid still with his hands behind his back afterward, and the Defendants have not contradicted this evidence.

By his own account, Becker did not comply with Elfreich's order to get on the floor after he was first bitten by Axel, but a reasonable jury could excuse his noncompliance.  That is, a jury could fairly infer that Becker could not get to the floor or reasonably feared that he would exacerbate his injuries by trying

to do so with his leg trapped in Axel's jaws.  Under such circumstances, disobedience does not necessarily justify force.  *See Cyrus*, 624 F.3d at 863.

The Defendants argue that Becker's "subjective perspective" as to whether he hid, complied with instructions, or resisted arrest are immaterial for determining whether Elfreich's force was reasonable.  (*See* Filing No. 98 at ECF pp. 2–3.)  They are correct: Reasonableness is "judged from the perspective of a reasonable officer on the scene," not that of the plaintiff.  *Graham*, 490 U.S. at 396.  But a jury could draw those conclusions from the *facts* Becker has asserted—that Becker said he would be downstairs shortly, came down within two minutes of that response, kept his hands on his head and then offered them to be cuffed—and that tips this factor in Becker's favor.

In sum, a jury could reasonably find that Elfreich lacked any rational basis to perceive that Becker hid when the police arrived or that he resisted arrest after Axel bit him.  This factor weighs heavily in Becker's favor as to all three exertions of force.

### d. A reasonable jury could find that Elfreich issued no warning before unleashing Axel.

By accepting Becker's testimony that he could have heard Elfreich's warning through the floor vent and that he never heard a warning, a jury could reasonably conclude that Elfreich issued no warning before unleashing Axel.  Elfreich reported that, while waiting to be transported to the hospital, Becker acknowledged that he heard Elfreich issue a warning.  (*See* Filing No. 83 at ECF p. 5.)  But Becker's own testimony contradicts that account and therefore creates a material dispute.

34

Some case law suggests that Elfreich could reasonably have unleashed Axel without first warning Becker—particularly if doing so would have compromised the officers' safety or if Becker had fled and Elfreich could not know where to direct an effective warning. *See Fallis*, 2011 WL 11724, at *10; *Johnson II*, 576 F.3d at 661. But the Defendants have not presented any evidence to show that they would have compromised their safety by warning Becker. And, by Becker's account, he responded to his mother's call, so a jury could reasonably conclude that Elfreich knew precisely where to direct a warning.

More importantly, the Defendants do not argue that the law does not require a warning; they argue that Elfreich issued a warning and that his warning made his subsequent actions reasonable. Problematically, though, Becker maintains that he could have heard any warning through the floor vent in his bedroom and that he heard nothing. For purposes of this motion, then, I must find that a jury could reasonably conclude that Elfreich issued no warning. Therefore, this factor weighs heavily in Becker's favor as to Axel's initial release and his continued biting of Becker's leg.

> **e. A reasonable jury could find that Elfreich exercised no control over Axel from the time he unleashed Axel until he ordered Axel to release Becker's leg roughly one minute later.**

On this factor, the parties' positions are fundamentally aligned. They agree that Elfreich unleashed Axel and that Axel remained unleashed until after Becker was handcuffed. They further agree that Axel ran out of Elfreich's sight for at least a few seconds after being unleashed and that Axel began

biting Becker before Elfreich saw Becker.  Finally, they agree that Elfreich is capable of controlling Axel through voice commands but that Elfreich issued no voice commands until after he had handcuffed Becker and Axel had bitten Becker for (by Becker's account) roughly one minute.

I therefore find that Elfreich exercised no control over Axel from the time he unleashed the dog until the time he handcuffed Becker and terminated the biting.  The Defendants argue strenuously that Elfreich undisputedly maintained complete control over Axel throughout the March 11 incident because he is capable of controlling Axel through voice commands even when Axel is out of his sight.  (*See* Filing No. 81 at ¶ 42, ECF p. 26.)  Actually, the parties only agree that Elfreich is *capable* of controlling Axel from a distance by voice commands.  (*Id.* at ¶ 42; Filing No. 85 at ¶ 39; Filing No. 81-7 at ECF p. 4:1–7.)  The critical question here is whether Elfreich actually *exercised* sufficient control over Axel during the March 11 incident, and there seems to be no dispute that (a) Elfreich could not see Axel when he first made contact with Becker, and (b) Elfreich issued no commands before handcuffing Becker.

The Defendants also argue that unleashing Axel was a necessary safety measure—that Elfreich was more likely to be ambushed by searching the house with Axel on a leash than by just letting the dog run free.  (Filing No. 81-7 at ECF pp. 23:25–24:9, 30:19–22.)  This may well be true, but the ultimate question is whether Elfreich's actions were reasonable.  *See Baird*, 576 F.3d at 344–45.  So Elfreich's safety concern justifies unleashing Axel only if he reasonably feared an ambush.  Having already determined that a jury

reasonably could find that Elfreich had no reason to fear for his safety, I must dismiss this argument.

This factor weighs heavily in Becker's favor as to the two dog bites.

### f. A reasonable jury could find that Elfreich allowed Axel to bite Becker for longer than was necessary to complete the arrest.

Becker estimates that Axel bit him for about one minute, and the Defendants have not challenged that estimate with an alternative number. Courts have questioned shorter bites. *See, e.g.*, *Campbell I*, 788 F. Supp. 2d at 671–72 (questioning reasonableness of allowing dog to attack plaintiff for up to 45 seconds). Moreover, Elfreich has testified that he reached Becker within a few seconds of unleashing Axel. This means a jury could find that, for nearly a whole minute, Elfreich could see that Becker was unarmed and had surrendered. Accordingly, a jury could reasonably find that Elfreich allowed Axel to bite Becker longer than was necessary to complete his arrest.

The Defendants seem to argue that Elfreich had to allow Axel to continue biting Becker until he was handcuffed because Overfield came down the stairs and surprised Elfreich. (*See* Filing No. 81 at ECF p. 17.) In other words, the unexpected presence of another person may have heightened Elfreich's perception of a safety risk.

But the Defendants do not make this argument explicitly. More importantly, Elfreich did not articulate any such concern in any of his statements in the record. (*See* Filing No. 83 at ECF pp. 5–6; Filing No. 81-7.)

In any event, a reasonable jury could discard this argument. The jury could find that Becker promptly surrendered and therefore presented no safety threat in the first place. Moreover, the jury could rationally question why, if Elfreich perceived Overfield as threatening his safety, and with Becker already incapacitated by Axel, Elfreich continued to deal with Becker instead of taking some action to subdue Overfield. *See DuFour-Dowell v. Cogger*, 969 F. Supp. 1107, 1121 (N.D. Ill. 1997) ("A police officer has reason to be startled when another person comes behind him while he is attempting to handcuff an arrestee. It is reasonable to quickly react by grabbing the other person.").

In short, because a jury could reasonably find that Becker never posed a safety threat and promptly surrendered, it also could reasonably conclude that Elfreich allowed Axel to bite him for far longer than was necessary to complete the arrest. This factor weighs heavily in Becker's favor as to Axel's continued biting.

> **g. A reasonable jury could find that, given the availability of other tactics, Elfreich acted unreasonably by unleashing Axel with instructions to bite and hold Becker.**

Becker has offered expert testimony suggesting that the facts did not warrant unleashing a dog to bite and hold Becker and that using a "find and bark" technique would have been more appropriate. (Filing No. 85-1 at ECF p. 21.) A jury reasonably could credit that testimony and find that Elfreich used more force than was necessary to effect the arrest. *See Olvera*, 2014 WL 3858362, at *13–14 (finding reasonableness of using police dog called into

question by expert's declaration). This factor weighs heavily in Becker's favor as to both dog bites.[20]

### 3. Conclusion: A reasonable jury could conclude that Elfreich applied excessive force when he unleashed Axel with instructions to bite and hold Becker, when he yanked Becker down the stairs, and when he allowed Axel to continue biting Becker's leg for nearly a minute after Becker surrendered.

Among the factors at work in the *Graham* analysis, only the violent nature of Becker's suspected crime supports a finding that Elfreich used appropriate force. Given the number and weight of the factors favoring Becker, I must conclude that a jury could reasonably find that Elfreich used more force than was necessary to arrest Becker when he unleashed Axel to bite and hold Becker, when he yanked Becker down the stairs, and when he placed his knee in Becker's back and allowed Axel to continue to bite Becker for nearly a minute after he had surrendered.

This conclusion does not change when I consider (as I must under *Graham*) "that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving . . . ." 490 U.S. at 396–97. "This was not an occasion on which the police were forced to make 'split-second judgments' in circumstances that were rapidly 'evolving.'"

---

[20] The Defendants take issue with Becker's expert's qualifications but stop short of arguing that his testimony would be inadmissible. (*See* Filing No. 98 at ECF p. 2 n.1.) Becker likewise asks the Court to treat the Defendants' expert's report as either inadmissible or unpersuasive. (*See* Filing No. 102 at ECF p. 2.) Because the Court cannot resolve factual disputes in ruling on a motion for summary judgment, *Abdullahi*, 423 F.3d at 773, I need not address these arguments here. The parties may present any objections to expert testimony for thorough consideration through motions in limine as they prepare for trial.

[Chew, 27 F.3d at 1443](#) (quoting [Graham, 490 U.S. at 397](#)).  The officers arrived when Becker was sleeping; his mother called for him; he said he would be downstairs momentarily; and he came downstairs within two minutes.  The circumstances evolved precisely as Becker said they would evolve.

Given the violent nature of Becker's alleged offense, Elfreich no doubt experienced some tension when he arrived on the scene.  But the Fourth Amendment still required him to behave reasonably.  *See* [Abbott, 705 F.3d at 731](#).  In light of all the circumstances, I cannot find as a matter of law that the allegations against Becker made it reasonable for Elfreich to unleash Axel with instructions to bite and hold the first person he encountered.  And I certainly cannot find that the allegations made it reasonable for Elfreich to yank Becker down the stairs, place his knee in Becker's back, and allow Axel to bite Becker for nearly a minute after Becker had surrendered and been immobilized.

The Defendants ultimately may prove that Elfreich's conduct was objectively reasonable.  This analysis would be different—and might lead to judgment for the Defendants—if they could establish that Becker actively hid, that he remained upstairs for 10 minutes after his mother called for him, and that Elfreich issued a loud, clear warning before unleashing Axel.  But, at this stage, the Court is not at liberty to resolve those assertions against Becker.  Becker is entitled to present his case to a jury, and the Defendants can strive to prevail upon the jurors that their version of the events is most believable.

To grant summary judgment, though, I would be forced to find that it was objectively reasonable for Elfreich to unleash Axel:

- without warning;

- only two minutes after waking Becker and hearing him say he was dressing and coming downstairs;

- strictly because Elfreich could not see Becker; and

- because he knew Becker was accused of threatening his brother-in-law with a knife three weeks before and threatening his roommates with other weapons six months earlier.

I also would have to find that, after Becker was in full view, had surrendered, and had one leg locked in a dog's jaws, Elfreich behaved reasonably by yanking Becker down several stairs, placing his knee in Becker's back, and then allowing the dog to bite Becker for nearly a minute.

The Fourth Amendment cannot condone either conclusion. The Fifth, Sixth, and Eighth Amendments would mean precious little if the Fourth licensed police officers to consciously maim suspects strictly for failing to be the first person to answer the door. Because I am not aware of any precedent construing the right to be free from excessive force so narrowly, and because the Defendants have failed to present any precedent to that effect, I decline to find the law has blessed Elfreich's actions as objectively reasonable.

### B. Elfreich is entitled to qualified immunity for his decision to unleash Axel with instructions to bite and hold Becker—but not for his subsequent actions.

The Defendants argue that, even if a jury could find Elfreich's actions unreasonable, the doctrine of qualified immunity relieves him of any liability. With qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of

which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Because "qualified immunity is immunity from suit, not merely a defense to liability," *Khuans v. Sch. Dist. 110*, 123 F.3d 1010, 1013 (7th Cir. 1997), courts should resolve questions of qualified immunity as early as possible, *Pearson v. Callahan*, 555 U.S. 223, 231–32 (2009).

"[Q]ualified immunity operates 'to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful.'" *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Saucier v. Katz*, 533 U.S. 194, 206 (2001)). The doctrine seeks to minimize, wherever possible, "the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office." *Harlow*, 457 U.S. at 814. It also is designed to combat "the danger that fear of being sued will 'dampen the ardor of all but the most resolute, or the most irresponsible [public officials], in the unflinching discharge of their duties.'" *Id.* (quoting *Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir. 1949)). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2085 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

"Qualified or 'good faith' immunity is an affirmative defense that must be pleaded by a defendant official." *Harlow*, 457 U.S. at 815. "When a defendant officer raises the defense of qualified immunity, the plaintiff bears the burden of showing the existence of the allegedly clearly established constitutional

right." *Clash v. Beatty*, 77 F.3d 1045, 1047–48 (7th Cir. 1996). "Immunity generally is available only to officials performing discretionary functions." *Harlow*, 457 U.S. at 816. Once that threshold matter is established, the analysis "traditionally involves a two-part inquiry. The first question is whether the defendants' conduct violated a constitutional right. The second question is whether that particular constitutional right was 'clearly established' at the time of the alleged violation." *Volkman v. Ryker*, 736 F.3d 1084, 1090 (7th Cir. 2013) (internal citations omitted).

Neither party disputes that Elfreich was a government official performing a discretionary function when he arrested Becker. And I already have found that a jury reasonably could decide that Elfreich committed three acts of excessive force. Therefore, the qualified immunity issue hinges entirely on the question of whether the law had clearly established Becker's rights to be free from each specific use of force at the time of his arrest.

### 1. A police officer's exertions of force are protected by qualified immunity unless pre-existing law has clearly established them as unconstitutional.

The "'clearly established' standard protects the balance between vindication of constitutional rights and government officials' effective performance of their duties by ensuring that officials can 'reasonably anticipate when their conduct may give rise to liability for damages.'" *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012) (internal quotations and ellipses omitted) (quoting *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)). A public official cannot "fairly be said to 'know' that the law forbade conduct not previously identified

as unlawful." *Harlow*, 457 U.S. at 818. But, "[w]here an official could be expected to know that certain conduct would violate statutory or constitutional rights, he should be made to hesitate; and a person who suffers injury caused by such conduct may have a cause of action." *Id.* at 819.

### a. The right in question must be cast in light of the specific facts of the case.

Before determining whether the law has clearly established a right, a court must determine what right is in question. The Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality." *al-Kidd*, 131 S. Ct. at 2084 (internal citations omitted). Construing a right too broadly saps qualified immunity of its value. *See Anderson v. Creighton*, 483 U.S. at 639 (remarking that overbroad construction can "convert the rule of qualified immunity . . . into a rule of virtually unqualified liability"). For example, the doctrine protects an officer who has used excessive force where legal uncertainty excuses his excess. To deny immunity because the right to be free from excessive force has been clearly established would render the defense valueless in excessive force cases.

Therefore, to judge whether a right was clearly established, a court must incorporate the factual circumstances and characterize the right more narrowly. For example, in *Baird*, the Seventh Circuit construed the constitutional violation not as "excessive force" or even "pointing a gun" but rather as pointing "a submachine gun at various people when there was no suggestion of danger, either from the alleged crime that was being investigated or the people he was targeting." 576 F.3d at 345–46. At bottom, "[t]he

contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton, 483 U.S. at 640.*

Because whether a right is clearly established "turns on a fact-sensitive examination of the dimensions of the constitutional violation, the question can be difficult to resolve as a matter of law on summary judgment where the parties' versions of events are as far apart as they are in this case." *Phelps, 2004 WL 1146489, at *12.* "If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate," even if there is an issue of material fact precluding a finding that the officer's actions were reasonable. *Saucier, 533 U.S. at 202 (2001), receded from on other grounds, Pearson, 555 U.S. at 236.* But, "[w]hen the qualified immunity inquiry cannot be disentangled from disputed facts, the issue cannot be resolved without a trial." *Gonzalez v. City of Elgin, 578 F.3d 526, 540 (7th Cir. 2009).*

> **b. A judicial precedent finding a constitutional violation on similar facts is helpful—but not essential—to establishing that the law clearly has established the right in question.**

A right has been clearly established if "'the law was clear in relation to the specific facts confronting the public official when he acted.'" *Volkman, 736 F.3d at 1090* (quoting *Colaizzi v. Walker, 812 F.2d 304, 308 (7th Cir. 1987)*). A plaintiff can satisfy this standard "by presenting a closely analogous case that establishes that the Defendants' conduct was unconstitutional or by presenting evidence that the Defendant's [sic] conduct was so patently violative of the

constitutional right that reasonable officials would know without guidance from a court." *Estate of Escobedo v. Bender*, 600 F.3d 770, 780 (7th Cir. 2010).

So pre-existing legal authority may clearly establish a constitutional right. *Id.* "While a case directly on point is not required, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Humphries v. Milwaukee Cnty.*, 702 F.3d 1003, 1006 (7th Cir. 2012) (quoting *al-Kidd*, 131 S. Ct. at 2083). Thus, the plaintiff must show that the right has been protected by either "controlling authority" or "a robust 'consensus of cases of persuasive authority.'" *al-Kidd*, 131 S. Ct. at 2084 (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999)). Therefore, in determining whether Becker's rights were clearly established, I will consider not only binding precedents from the Supreme Court and the Seventh Circuit but also opinions from other circuit and district courts. *Accord., e.g.*, *Payne v. Pauley*, 337 F.3d 767, 780 (7th Cir. 2003) (collecting excessive force cases concerning overtightened handcuffs from the Seventh Circuit, the Northern District of Illinois, the Sixth Circuit, and the Ninth Circuit).

But a plaintiff also can show that a constitutional right has been clearly established without pointing to case law. *See Hope*, 536 U.S. at 741. "Although earlier cases involving 'fundamentally similar' facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding."[21] *Id.* And, in some cases, a plaintiff

---

[21] Obviously, if every plaintiff had to point to a case holding an officer liable on similar facts, Section 1983 would have no value. No plaintiff could prove a claim because no plaintiff before him would have a victorious claim on which to base it. Consequently,

46

can show that a right is clearly established without citing any precedent whatsoever.[22]

### 2. The law has not clearly established that an officer offends the Fourth Amendment by unleashing a dog with instructions to bite and hold a suspect under the circumstances present here.

To determine whether Elfreich is entitled to qualified immunity for his first use of force, I must determine whether the law clearly established as of March 11, 2011, that a police officer violates a person's Fourth Amendment right to be free from excessive force by unleashing a dog with instructions to bite and hold a suspect:

- without first issuing a warning;

- where the only grounds to expect danger are that the suspect has been accused of committing violent crimes six months and three weeks ago; and

- where the officer's only basis for believing that the suspect was hiding is that he was not the first person to the door when the police arrived.

---

"officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope*, 536 U.S. at 741.

[22] *E.g.*, *Baird*, 576 F.3d at 345 ("Indeed, in some rare instances where the constitutional violation is obvious, a plaintiff need not show any analogous cases, 'as widespread compliance with a clearly apparent law may have prevented the issue from previously being litigated.'") (quoting *Denius v. Dunlap*, 209 F.3d 944, 951 (7th Cir. 2000)); *Kernats v. O'Sullivan*, 35 F.3d 1171, 1176 (7th Cir. 1994) ("[I]ndeed one need not cite a case at all if the constitutional violation is obvious."); *Howard v. Ealing*, 876 F. Supp. 2d 1056, 1074 (N.D. Ind. 2012) ("A plaintiff may defeat a qualified immunity defense by showing that 'the conduct at issue is so egregious that no reasonable person could have believed that it would not violate clearly established rights.'") (quoting *Wheeler v. Lawson*, 539 F.3d 629, 639 (7th Cir. 2008)).

Although I find that a jury reasonably could find that Elfreich used excessive force when he unleashed Axel under these circumstances, I also find the law sufficiently unsettled to entitle Elfreich to qualified immunity.

As a starting point, I note that no precedent binding this Court requires an officer to issue a warning before unleashing a dog to bite and hold a suspect. Nor has any binding precedent forbidden an officer to unleash a dog with instructions to bite and hold a suspect presenting so minimal a safety threat as Becker.

Next, I look to whether authority from other jurisdictions has clearly found the right in question here (or any component of it) clearly established. In *Campbell II*, the Sixth Circuit found that the law had clearly established that officers violate the Fourth Amendment by using an inadequately trained dog to bite and hold a non-threatening suspect without warning. *See* 700 F.3d at 789. But I cannot find Elfreich's actions clearly unlawful on the basis of *Campbell II* alone. First, the dog used in *Campbell II* was inadequately trained, and Becker has levied no allegations concerning Axel's training. Second, *Campbell II*'s holding is by no means universal. In fact, numerous other courts have found no clearly established constitutional violation where an officer unleashes a dog to bite and hold a suspect—even without a warning.[23]

---

[23] *See, e.g.*, *McKay*, 949 F. Supp. 2d at 984 (finding that the law had not clearly established by May of 2011 that failing to warn before unleashing dog is unconstitutional); *Fallis*, 2011 WL 111724, at *11–12 (finding that no right to warning had been clearly established in the Ninth Circuit or elsewhere); *Pace*, 489 F. Supp. 2d at 1335–36 (finding that officer did not violate clearly established law by using dog to apprehend fleeing felon without warning); *Ingram*, 2004 WL 1242761, at *6 (finding that plaintiff had no clearly established right to be arrested without use of dog).

On a similar note, I find no consensus of authority in this jurisdiction or elsewhere clearly establishing the legal principles on which I have found that a jury could find Elfreich's conduct unreasonable. Although I hold that an officer should be able to articulate a rational basis for believing a suspect is armed before inflicting violence commensurate with that belief, plenty of authority (including much from the Seventh Circuit) suggests that an officer may assume a suspect is armed and exert corresponding force until he can confirm otherwise. *See, e.g.,* *DeLuna*, 447 F.3d at 1012 ("Peraza could not know whether DeLuna possessed a weapon in the back of his waistband.") [24]; *Alicea*, 2014 WL 4311079, at *6. Likewise, I hold that officers should not exert force on grounds that a suspect is hiding without some evidence to support that belief, but others have disagreed. *See* *Fallis*, 2011 WL 11724, at *9 ("The officers did not know where or if Fallis was hiding."). I find no consensus of decisions—and certainly none that would bind a court in the Seventh Circuit— requiring officers to issue warnings before unleashing police dogs. *Compare* *Kuha*, 365 F.3d at 598; *to* *Fallis*, 2011 WL 11724, at *10; and *Alicea*, 2014 WL 4311079, at *7. And there is no consensus that unleashing a police dog to bite and hold a suspect is unlawful, *see* *Williams v. Hainje*, 2008 WL 4298499, at *6, even where the circumstances arguably call for a less extreme tactic.

Finally, I cannot find that Elfreich's release of Axel was so egregious or obviously excessive that no reasonable officer could have found his decision

---

[24] I reiterate that I do not endorse this reading of *DeLuna* (*see* Section III(A)(1)(b) above), but I must acknowledge that a reasonable officer could interpret it this way.

objectively reasonable. Indeed, the widespread division among the courts on this issue demonstrates that reasonable officers presented with these circumstances might reach competing conclusions.

Accordingly, I cannot find that Elfreich should have known he would violate Becker's Fourth Amendment rights by unleashing Axel with instructions to bite and hold Becker without warning, even though he had no particular reason to believe that Becker was hiding or that he would pose a threat to anyone's safety.

As the law applied at the time, Elfreich could have believed that he was entitled to assume that Becker was hiding, armed, and dangerous and that unleashing Axel to find, bite, and hold him was a proper course of action—even without a warning. I hold that his belief was mistaken. But his mistake would have been reasonable under the law. Therefore, I find that Elfreich is immune from liability for unleashing Axel with instructions to bite and hold Becker.

**3. Clearly established law would have notified any competent officer that the Fourth Amendment would prohibit pulling an arrestee face-first down the stairs after a dog had bitten his leg and he had surrendered.**

To determine whether Elfreich is entitled to qualified immunity for his second use of force, I must determine whether the law clearly established as of March 11, 2011, that a police officer violates a person's Fourth Amendment right to be free from excessive force by grabbing him by the front of the shirt collar and forcefully pulling him down several stairs even though the suspect:

- had stated his surrender;

- had visibly displayed his weaponless hands;

- had one leg immobilized by a police dog's bite; and

- had given the officer no particular reason to believe he would flee, resist arrest, or otherwise threaten anyone's safety.

The law had clearly established this conduct as violative and therefore precludes Elfreich from qualified immunity.

In *Gonzalez*, the Seventh Circuit clearly established that an officer uses excessive force by physically assaulting a person without provocation. *See* 578 F.3d at 541. *Accord. Abbott, 705 F.3d at 732* ("Prior to 2007, it was well-established in this circuit that police officers could not use significant force on nonresisting or passively resisting suspects."). In *Gonzalez*, a group of friends ran to a nearby restaurant after learning that some other friends had been assaulted there. *Id.* at 530. Police arrived shortly thereafter and began beating and arresting people from the group without provocation. *Id.* at 530–36.[25] Denying qualified immunity, the court held that "it is clearly established that officers may not, without provocation, start beating, pepper-spraying, kicking, and otherwise mistreating people standing around a restaurant parking lot (even in the middle of the night)." *Id.* at 541. The Defendants have presented no reason that this principle should not apply to the facts Becker has presented.

---

[25] Arguably, the police in *Gonzalez* were more justified than Elfreich. Coming to the scene of an alleged assault, the officers may have perceived the plaintiffs as the perpetrators of a violent crime in progress (or at least very recently in progress). *See* 578 F.3d at 531–32. Elfreich had no such reason to fear violence from Becker by the time he reached him on the stairs.

The rule articulated in *Gonzalez* resonates in a series of opinions from this Court:

- In *Hayes v. City of Indianapolis*, Judge Hamilton held that "[i]t has long been well established that a police officer may not continue to use force against a suspect who is subdued and complying with the officer's orders." No. 1:08-cv-006-DFH-JMS, 2009 WL 700232, at *4 (S.D. Ind. Mar. 16, 2009).

- In *Bowden v. Town of Speedway, Indiana*, Judge Hamilton found evidence to support "a clear and obvious unconstitutional use of force" after an officer pushed a suspect who already had been searched for weapons and merely backed away from the car the officer sought to search. 539 F. Supp. 2d 1092, 1097, 1109–10 (S.D. Ind. 2008).

- In *Norris*, Judge Hamilton found that the law had clearly established "that the use of force unnecessary for an arrest, particularly where force is applied to a suspect who is not fleeing or resisting, and who has been overcome, cannot be considered constitutionally reasonable." 2006 WL 753131, at *14 (S.D. Ind. Mar. 21, 2006).

- And, in *Phelps*, Judge Hamilton held that "it was clearly established that 'police officers do not have the right to shove, push, or otherwise assault innocent citizens without any provocation whatsoever.'" 2004 WL 1146489 at *13 (quoting *Clash*, 77 F.3d at 1048).

Taken together with *Gonzalez*, these cases have left police officers in this jurisdiction no excuse for believing that they may exert force over suspects who do not attempt to flee, resist arrest, or otherwise pose safety threats.

Had no court before me held that the law clearly prohibits forcibly pulling a surrendered, unarmed suspect down a set of stairs, I would not hesitate to find that principle clearly established by March of 2011. In 2010, the Seventh Circuit plainly held that "[f]orce is reasonable only when exercised in proportion to the threat posed." *Cyrus*, 624 F.3d at 863. I trust that no

competent officer would have doubted that Elfreich's conduct exceeded the threat he faced based on Becker's account.

On the facts presented, Elfreich lacked any reason to perceive a threat by the time he encountered Becker on the stairs. Elfreich no longer could believe Becker was hiding; he was in plain sight. Becker's empty hands were on his head and in plain view, so Elfreich should have known he was unarmed.[26] Becker was not attempting to flee. In fact, he could not have fled: Axel was holding his left ankle. And Becker did nothing to resist the dog. Instead, he pleaded for Elfreich to "Call the dog off. I'm coming towards you." (Filing No. 93-1 at ECF p. 8:4.)

Becker was an "immobilized and unresisting" arrestee, *see Phelps*, 2004 WL 1146489, at *12, and any reasonable officer would have known it would be unconstitutional to grab him by the shirt collar and yank him face-first down stairs. Accordingly, Elfreich is not immune from liability for charges that he used excessive force in taking Becker to the ground.

### 4. Clearly established law also would have notified any competent officer that the Fourth Amendment would prohibit allowing a police dog to continue biting an unarmed, nonresisting arrestee's leg for nearly a minute after he had surrendered.

To determine whether Elfreich is entitled to qualified immunity for his third use of force, I must determine whether the law clearly established by March 11, 2011, that a police officer violates a person's Fourth Amendment

---

[26] Moreover, the record gives no indication that Elfreich ever searched Becker for weapons. This undermines any contention that Elfreich reasonably believed Becker was armed.

right to be free from excessive force by placing his knee in the suspect's back and allowing a dog to bite the suspect for nearly one minute after the suspect:

- surrendered;

- offered no resistance; and

- demonstrated that he was unarmed.[27]

The law had clearly deemed this conduct violative and therefore precludes Elfreich from qualified immunity.

First, several courts have held that the law has clearly established that an officer uses excessive force by allowing a police dog to continue biting a suspect who has surrendered and no longer presents a threat to flee or resist arrest. In *Edwards*, for example, the Eleventh Circuit found that the law had clearly established by 2008 that the Constitution forbids allowing a dog to bite a suspect for five-to-seven minutes, "especially where that suspect is pleading for surrender." *See* 666 F.3d 1289, 1298 (11th Cir. 2012). Similarly, in *Watkins v. City of Oakland, California*, the Ninth Circuit found that the law had clearly established that allowing a dog to bite an arrestee for the "excessive duration" of perhaps 30 seconds "could constitute excessive force that would be a constitutional violation." *See* 145 F.3d 1087, 1090, 1093 (9th Cir. 1998).

Two such precedents come from district courts in our Circuit. In *Williams v. Hainje*, the Northern District of Indiana held that "there can be no

---

[27] For the reasons I explained in Section III(A)(2)(f) above, I have not factored Overfield's presence on the stairs into this analysis. Only the Defendants' rhetoric—not any evidence—suggests that her appearance required Elfreich to wait to remove Axel. (*See* Filing No. 81 at ECF p. 17; Filing No. 83 at ECF pp. 5–6; Filing No. 81-7.)

question that the use of a police dog on an individual who was offering no resistance would violate the Fourth Amendment.  There also can be no question that this is a 'clearly established' right."  2008 WL 4298499 at * 8. And, in *Fidler v. City of Indianapolis*, Judge Hamilton held that "no reasonable officer could have believed that the Constitution would permit an officer to . . . purposefully order" a dog to attack a suspect "after he ceased fleeing and lay on the ground," offered his hands to be cuffed, and said, "I give up."  428 F. Supp. 2d 857, 865 (S.D. Ind. 2006).

Second, even if I was not persuaded by these cases, I would find myself bound to deny qualified immunity by the precedents I addressed in Section III(B)(3) of this Entry.  The Seventh Circuit and this Court have held that the law has clearly established that the Constitution prohibits police officers from exerting physical force over suspects who are not attempting to flee, resisting arrest, or otherwise posing safety threats.  That rule must apply with even greater force here: If the law has clearly established that an officer may not shove or tackle a suspect who has surrendered and who presents no safety threat or flight risk, it has established by logical extension that the officer may not exert even greater force by allowing a dog to bite the suspect for nearly a minute under the same circumstances.

Finally, I reiterate the foundational principle that an officer may use only such force as is necessary to complete an arrest.  *See Abbott*, 705 F.3d at 724. The Seventh Circuit plainly held in 2010 that "[f]orce is reasonable only when exercised in proportion to the threat posed."  *Cyrus*, 624 F.3d at 863.  By

allowing Axel to bite Becker for so long after he had surrendered, Elfreich crossed this line.

By the time Elfreich placed his knee in Becker's back and began to handcuff him, Becker was lying face-down on the floor with his leg caught in Axel's jaws. Becker placed his hands behind his back so Elfreich could cuff them—and thereby allowed Elfreich to see that he was unarmed. And Becker had both verbally indicated his surrender and corroborated the veracity of his surrender through his actions.

In sum, Becker was neither resisting nor fleeing, and any rational cause to fear resistance or flight had evaporated. Any reasonable officer would have understood that the Fourth Amendment prohibited continued force—and particularly such extreme force as allowing a dog to bite Becker's leg for nearly a minute. I therefore must find that Elfreich is not immune to liability for charges that he placed his knee in Becker's back and refrained from ordering Axel to stop biting Becker's leg for nearly a minute after he had surrendered.

### C. Conclusion: Elfreich is entitled to partial summary judgment on Counts IV and VI of the Amended Complaint.

Having found that qualified immunity protects Elfreich for unleashing Axel with instructions to bite and hold Becker, I **GRANT** the Defendants' motion to the extent Count IV or Count VI would hold him liable for that action. However, because a reasonable jury could find his subsequent actions unreasonable, and because clearly established law forbade those actions, I

otherwise **DENY** the Defendants' motion as it applies to the Count IV and Count VI claims against Elfreich.

## IV. The City of Evansville is entitled to partial summary judgment on Becker's Section 1983 excessive force claims.

Becker also seeks to hold the City liable under Section 1983 for violating his Fourth Amendment right to be free from excessive force. The Defendants seek summary judgment, arguing that Becker cannot show that a City or EPD policy, practice, or custom caused his injuries and that he therefore has raised *respondeat superior* claims forbidden by the Supreme Court's ruling in *Monell v. Department of Social Services. See* 436 U.S. 658 (1978).

Becker has articulated distinct flaws in two EPD policies, and a reasonable jury could find that one or two of those shortcomings were the "moving force" behind Elfreich's unconstitutional exertions of force. I therefore must preserve two of Becker's claims for municipal liability. However, the City is entitled to summary judgment on a third claim.

### A. Becker may prevail on his *Monell* claim by proving that the EPD's policies reflected "deliberate indifference" toward the Fourth Amendment and constituted the "moving force" behind Elfreich's unconstitutional conduct.

Although suable under Section 1983, municipalities pose considerations not present with individual defendants. "[A] municipality is not vicariously liable for the constitutional torts of its employees but is answerable only for the consequences of its policies." *Dye v. Wargo*, 253 F.3d 296, 298 (7th Cir. 2001) (citing *Monell,* 436 U.S. 658). This rule prevents governments from being held liable "'solely on the basis of the existence of an employer-employee

relationship with a tortfeasor'" and stems from doubt that Congress intended to use the threat of liability "'to oblige municipalities to control the conduct of *others*.'" *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403 (1997) (emphasis in original) (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 478–79 (1986)).

To hold a municipality liable, the plaintiff must prove that the municipality's "*deliberate* conduct . . . was the 'moving force' behind the injury alleged." *Id.* at 404 (emphasis in original). "That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Id.* The plaintiff carries this burden by proving that "the unconstitutional act complained of is caused by: (1) an official policy adopted and promulgated by [the municipality's] officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority." *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2009) (citing *Monell*, 436 U.S. at 690; *Valentino v. Vill. of S. Chicago Heights*, 575 F.3d 664, 674 (7th Cir. 2009)).

Where a policy is facially unconstitutional—where it *compels* municipal agents to violate rights—the plaintiff establishes culpability simply by showing that the municipality's application of the policy caused her injury. *See Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. at 404–405; *City of Okla. City v. Tuttle*, 471 U.S. 808, 822 (1985) (plurality opinion). Where the plaintiff alleges that a facially constitutional policy nevertheless *allowed* or *authorized* an agent to

violate her rights, she still may prevail by proving that the municipality enacted the policy "with 'deliberate indifference' as to its known or obvious consequences." *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. at 406–407 (quoting *City of Canton, Ohio v. Harris*, 489 U. S. 378, 388 (1989)).  In other words, a municipality can be liable for "continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees." *Id. at 407*.[28]

A plaintiff who can point to only a single unconstitutional application of a facially constitutional policy faces a steep climb.  This is because such a plaintiff "can point to no other incident tending to make it more likely that the plaintiff's own injury flows from the municipality's action"—enacting the policy—"rather than from some other intervening cause." *Id. at 408–409*.

But a plaintiff may prevail on a *Monell* claim grounded in a single application of a facially constitutional policy so long as she proves that the policy was the "moving force" causing her injury.  *See id. at 404–405*.  As the Seventh Circuit explained in *Ross v. United States,* a municipal policy's authorization of unconstitutional conduct "represents a policy rightly attributed to the governmental entity, and in such a case, there is no need to resort to proof of the policy's multiple applications to attribute its existence to

---

[28] The Defendants cite *Campbell v. Miller* for the proposition that "a discretionary decision by an officer cannot support a *Monell* claim."  (Filing No. 98 at ECF pp. 11–12 (citing 499 F.3d 711, 718–20 (7th Cir. 2007)).)  I find no language to that effect in *Campbell*.  Moreover, the Defendants' reading would conflict with *Brown*'s recognition that a *Monell* claim can arise out of a policy that authorizes but does not compel unconstitutional action.

the municipality." 910 F.2d 1422, 1430 (7th Cir. 1990) (citing *Pembaur, 475 U.S. at 480–81*; *Yeksigian v. Nappi*, 900 F.2d 101, 104 (7th Cir. 1990)). Where the plaintiff shows "that the alleged policy came from the highest level of decisionmakers in" the municipality, "even a single application of the policy is fairly attributed" to the government. *Id.*

In *Bowden*, this Court illustrated how a plaintiff can establish municipal liability through a single unconstitutional incident authorized—but not compelled—by a municipal policy. The plaintiff sued the Town of Speedway, its Police Department, and an individual officer he accused of applying excessive force while arresting him without probable cause. 539 F. Supp. 23 at 1095. The Speedway Police Department maintained a formal policy (consonant with state certification requirements) requiring officers to complete "a minimum of 16 hours of in-service training per year," but it expressly disavowed any responsibility for monitoring officers' completion of that training. *Id.* at 1107. The defendant officer failed to complete his training requirement for the years preceding and including the incident. *Id.*

Judge Hamilton denied the defendants' motion for summary judgment on the plaintiff's *Monell* claims. A reasonable jury, he explained, could "find that Speedway's policy was to announce a superficially acceptable training 'requirement' and then simply to hope that its officers voluntarily met the requirement." *Id.* at 1108. "A jury could also find that it was foreseeable to the town that such a hollow policy would result in these types of constitutional

violations." *Id.* Accordingly, the plaintiff could satisfy the "deliberate indifference" standard. *Id.* at 1107–1108.

**B. A reasonable jury could find that the EPD's policies reflected "deliberate indifference" toward the Fourth Amendment and caused some—but not all—of Elfreich's conduct.**

Becker has identified two EPD policies as precipitating Elfreich's unconstitutional conduct and causing his injuries: EPD Standard Operating Procedures 359.00 ("SOP 359.00") and 359.03 ("SOP 359.03"). SOP 359.00, entitled "Use of Force," describes when and how officers may use force and how the EPD will respond when officers use force. (*See* Filing No. 81-5 at ECF pp. 1–19.) SOP 359.03, entitled "The Canine (K-9) Unit," describes when and how EPD officers may use dogs in the field, how officers and dogs are selected and trained, and how the EPD will respond when officers use dogs in the field. (*See* Filing No. 81-6 at ECF pp. 1–10.)

In Count VI of the Amended Complaint, Becker argues that SOP 359.00 fails to adequately explain when officers may and may not use force against arrestees. In Count V, Becker criticizes SOP 359.03 for failing to require officers to remain in position to exercise complete control over dogs they unleash. Becker further argues in Count V that SOP 359.03 is deficient because it contains no provision ensuring that police dogs will not bite nonresisting, nonfleeing suspects. The City is entitled to summary judgment as to Becker's third *Monell* claim, but he may present the others to a jury.

### 1. A reasonable jury could find that the City caused some of Becker's injuries by failing to explain in SOP 359.00 or elsewhere when officers must terminate their exertions of force against arrestees.

SOP 359.00 instructs that "[o]fficers will only use a reasonable amount of force when necessary to affect a lawful arrest, attain a lawful objective or overcome an attack upon themselves or another person." (Filing No. 81-5 at ECF p. 1.) SOP 359.00 further instructs that, "[w]hen the subject of the force has been overcome and is under complete control, all force against him will cease." (*Id.* at ECF pp. 1–2.)

The policy goes on to define twelve terms used in SOP 359.00, but "under complete control" is not among them. By my reading, the passage quoted above constitutes the only portion of SOP 359.00 addressing the circumstances under which an officer must terminate his exertion of force against an arrestee. And neither party has offered any other policy or training material elaborating on that sentence.

By Becker's estimation, the EPD's failure to define "under complete control" reflects deliberate indifference toward the Fourth Amendment by authorizing officers to continue using force after the Constitution would forbid it. The policy's framers, he contends, should have foreseen that each officer would be left to decide for herself when a suspect is under such control that continued use of force is unreasonable. Further, they should have anticipated that some officers would determine that a suspect is not under complete control even after demonstrating that he is no threat to flee, resist arrest, or

62

otherwise endanger an officer or the public—at which point the Fourth Amendment would condemn force.  Becker has offered the opinion of Dr. Christopher Chapman, a consultant in the fields of law enforcement and criminology, suggesting that the EPD should instead have instructed its officers to use force only to the extent necessary "to overcome an arrestee's resistance." (Filing No. 85-1 at ECF p. 25.)

The Defendants argue that the policy is sufficient despite its lack of a definition.  "Any reasonable person," they argue, "can understand that a police department's force policy referring to 'complete control' of a suspect would mean the person is under the authority of a police officer in such a manner as to no longer be a threat to that officer or others."  (Filing No. 81 at ECF p. 27.) That definition, they imply, confines officers' applications of force to what the Fourth Amendment permits.

Ultimately, a jury may agree, but I find the matter sufficiently disputed to preclude summary judgment.  First, a jury reasonably could decline to find that SOP 359.00 intones the Defendants' definition of "under complete control." The Defendants have offered no evidence to support their assertion that "[a]ny reasonable person" would so interpret the policy.  Conjecture is no basis for summary judgment.

Second, a reasonable jury could find that the Defendants' definition of "under complete control"—even if it plainly emanates from the policy—remains deliberately indifferent to citizens' Fourth Amendment rights.  Dr. Chapman maintains that a policy respectful of the Fourth Amendment would instruct

officers to use force only as necessary to overcome resistance. (Filing No. 85-1 at ECF p. 25.) Conversely, the Defendants' construction of SOP 359.00 would authorize an officer to use force until her suspect is "under the authority of a police officer." (Filing No. 81 at ECF p. 27.) But the reasonableness of force is based on the threat an arrestee presents—not whether an officer has authority over him. *See Cyrus*, 624 F.3d at 863 ("Force is reasonable only when exercised in proportion to the threat posed . . . ."). A reasonable jury could find that Dr. Chapman's policy honors that standard and that the Defendants' interpretation of SOP 359.00 does not.

A reasonable jury could read SOP 359.00 and determine that it (a) authorizes officers to use force in executing arrests, but (b) does not require them to terminate force once the arrestee has demonstrably ceased to present any threat. That jury also could rationally conclude that the policy reflects deliberate indifference to citizens' Fourth Amendment protections. And, because the jury could reasonably conclude that Elfreich failed to terminate his force even after Becker demonstrably ceased to present any threat, the jury could reasonably conclude that the policy's shortcomings were the moving force behind *some* of Elfreich's excessive exertions of force.

Unlike SOP 359.00, SOP 359.03 includes clear instructions for terminating use of a police dog: "When a K-9 apprehends by biting a suspect; generally, as soon as the handler can tell that the suspect is not holding a weapon or does not have immediate access to a weapon, he should immediately call the dog off and leash him." (Filing No. 81-6 at ECF p. 16.) In other words,

SOP 359.03 commanded Elfreich to recall Axel as soon as he could tell Becker was unarmed. Therefore, any ambiguity in SOP 359.00 could not have been the moving force behind Elfreich's excessive use of Axel.

So I **DENY** the Defendants' motion as to any claim that deficiencies in SOP 359.00 caused injuries Becker sustained because Elfreich yanked Becker down the stairs or placed his knee in Becker's back while handcuffing him. But I **GRANT** the motion as to any claim that deficiencies in SOP 359.00 caused any injuries Becker sustained as a consequence of being bitten by Axel.

> **2. A reasonable jury could find that the City caused some of Becker's injuries by failing to require in SOP 359.03 or elsewhere that officers constantly remain in position to exercise complete control over their dogs.**

SOP 359.03 describes the limited circumstances under which EPD officers are authorized to employ police dogs[29] and even more limited circumstances under which officers are authorized to unleash those dogs to search for suspects. (*See* Filing No. 81-6 at ECF pp. 2, 3–4.) The policy acknowledges that the EPD's dogs are "trained to bite and hold when apprehending suspects" and that use of a police dog "will probably result in an injury to the suspect." (*Id.* at ECF pp. 2, 6.) In fact, Elfreich has testified that each EPD dog is trained to find, bite, and hold the first person it finds—even if that person is not the target of the search, is unarmed, or has surrendered.

_____

[29] It is not clear to me that executing an arrest warrant falls among the seven circumstances under which SOP 359.03 authorizes use of a dog. (*See* Filing No. 81-6 at ECF p. 2.) But Becker's argument rests on the assumption that the policy authorized Elfreich's use of Axel, and the Defendants have not argued that Elfreich violated the policy by utilizing Axel, so I proceed on the assumption that the policy authorized Elfreich's conduct.

(Filing No. 81-7 at ECF pp. 6:18–24, 10:2–16; Filing No. 93-3 at ECF p. 5:20–25.)

Even so, Becker laments, no provision in SOP 359.03 requires an officer to exercise complete control over her dog during a search. The policy's authors, he says, should have foreseen that omitting this safeguard would produce a situation like the one Becker alleges: An officer unleashes a dog as authorized by the policy, and the dog dashes out of the officer's site and bites an unarmed, compliant arrestee before the officer ever reaches a position to observe the arrestee and call off the dog. Instead, Becker argues, the officer should be required to remain in position to observe the suspect first and prevent the dog from ever biting an unarmed, compliant arrestee.

Dr. Chapman has characterized this policy as reflecting deliberate indifference toward citizens' Fourth Amendment rights. (*See* Filing No. 85-1 at ECF p. 18.) As he puts it, the EPD "has entrusted and assumed K-9 Axel had the ability for the intricate thought process necessary to take a dynamic problem and comprehend, conceive, and initiate a [sic] objectively reasonable human solutions, which may need to change as the incident progresses." (*Id.*) In other words, SOP 359.03 delegates to police dogs (as opposed to their human handlers) the responsibility of assessing the threat posed by a suspect and determining what level of force is appropriate. (*Id.*)

The Defendants argue that Becker's complaint is unfounded because, "despite the [sic] Axel's release, Elfreich retained complete control over Axel by voice command." (Filing No. 81 at ECF p. 26.) That is, because Axel is trained

to respond to Elfreich's voice commands, Axel remains under Elfreich's control even when he runs out of Elfreich's sight.

This response misconstrues the issue.

Regardless of whether Elfreich was capable of controlling Axel through voice commands, he did not position himself to issue the appropriate command at the appropriate time. By the time Elfreich could see Becker and recognize that he was unarmed and surrendering, Axel had already bitten Becker. Becker claims that SOP 359.03 is deficient because it does not require officers to position themselves to exercise appropriate control over their dogs.

Dr. Chapman's testimony creates a factual dispute precluding summary judgment. A reasonable jury could accept that testimony and conclude that the EPD should have foreseen the circumstances that transpired here and forbidden officers to allow unleashed dogs trained to bite and hold out of their sight. The jury also could reasonably conclude that the absence of such a restriction constituted the moving force behind the unconstitutional uses of force causing Becker's dog bite injuries.[30]

The jury also could reasonably decide otherwise. For example, it might conclude that Becker's injuries were not proximately caused by Elfreich's decision to unleash Axel and let him run ahead but by Elfreich's failure to warn

---

[30] Unlike Elfreich, the City is not protected by qualified immunity. *Owen v. City of Independence, Mo.*, 445 U.S. 622, 650 (1980). Therefore, it may be liable for Elfreich's decision to unleash Axel (which, as I explained in Section III(A) above, a jury could reasonably deem unconstitutional).

Becker—as SOP 359.03 required—that he was unleashing Axel.  (*See* Filing No. 81-6 at ECF p. 3.)

But the facts presented do not compel that judgment.  I therefore **DENY** the Defendants' motion and grant Becker leave to proceed with his claim against the City for failing to require officers to remain in position to exercise appropriate control over their police dogs.

### 3. Becker has not identified another basis for deliberate indifference in SOP 359.03.

In Count VI of the Amended Complaint, Becker also characterizes SOP 359.03 as deliberately indifferent on grounds that it fails "to establish a policy that ensured the K-9 would not engage (bite) suspects if the suspect was not resisting, fleeing or endangering the safety of an officer or the public." (Filing No. 58-1 at ¶ 51.)  Apart from requiring officers to remain in position to exercise complete control over their dogs, neither Becker nor Dr. Chapman has specified how the City should have changed SOP 359.03 to foreclose every possibility that a nonresisting, nonfleeing, nonthreatening suspect might be bitten by a police dog.

To the extent that paragraph 51 of the Amended Complaint identifies a flaw in SOP 359.03, Becker cannot prove that it caused his injuries.  A policy does not become a basis for municipal liability because it fails to preclude every chance of unconstitutional conduct.  Rather, the policy must cause unconstitutional conduct—either because it compels municipal agents to derogate constitutional rights or because it authorizes municipal agents to take

actions that are obviously likely to derogate constitutional rights.  *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. at 404–405, 406–407.

For example, SOP 359.03's failure to require officers to remain in position to exercise complete control over their dogs does not raise a triable claim of municipal liability simply because it allows for some possibility that a dog will bite a compliant suspect.  It raises a triable claim of municipal liability because (a) the EPD trains each dog to indiscriminately bite and hold the first person it finds; (b) SOP 359.03 expressly authorizes off-leash searches; and (c) a jury therefore could find that unconstitutional dog bites obviously will result if the policy authorizes an officer to allow an unleashed dog run out of her sight.

That SOP 359.03 does not explicitly protect against every unconstitutional act does not make it a source of municipal liability.  The policy does not compel unconstitutional conduct.  And, aside from the possibility that an unleashed dog would run ahead of its handler and attack a compliant person before a recall command is issued, Becker has not identified an obvious unconstitutional consequence of the policy.  Therefore, a reasonable jury could not find another basis for deliberate indifference in SOP 359.03, and I must **GRANT** the Defendants' motion for summary judgment as to any claim stated in paragraph 51 of the Amended Complaint.

## V.   The Defendants are not entitled to summary judgment on Becker's battery or negligence claims.

In Counts I and III of the Amended Complaint, Becker claims that Elfreich's uses of force amounted to battery and negligence under Indiana law,

and he seeks also to recover against the City as Elfreich's employer.  (*See* Filing No. 58-1 at ¶¶ 37–43.)  The Defendants argue that Becker's claims are barred by two separate provisions of the Indiana Tort Claims Act (ITCA) or because the undisputed evidence shows that Elfreich's conduct was objectively reasonable.  These arguments fail.

### A. Because a reasonable jury could find Elfreich's conduct "willful and wanton," the ITCA does not protect Elfreich.

The Defendants argue that Elfreich is immune to Becker's state law claims because, under the ITCA, "[a] lawsuit alleging that an employee acted within the scope of the employee's employment bars an action by the claimant against the employee personally."  Ind. Code § 34-13-3-5(b) (*quoted in* Filing No. 81 at ECF p. 27).  Because Becker has conceded that Elfreich acted within the scope of his employment (*see* Filing No. 58-1 at ¶ 1), they reason, Elfreich must be entitled to immunity.

But immunity does not extend to "willful and wanton" actions, even if the employee commits them within the scope of his employment.  Ind. Code § 34-13-3-5(c)(4).  Because a reasonable jury could find that Elfreich's uses of force were willful and wanton, the ITCA does not protect Elfreich.

Under Indiana law, a plaintiff proves that conduct is willful and wanton by establishing two elements.  First, she must show that the defendant knew of impending danger or was conscious of a course of conduct "calculated to result in probable injury."  *Ellis v. City of Martinsville*, 940 N.E.2d 1197, 1205 (Ind. Ct. App. 2011) (quoting *U.S. Auto Club, Inc. v. Smith*, 717 N.E.2d 919, 924 (Ind. Ct. App. 1999)) (internal quotations omitted).  Second, she must show that the

defendant's conduct "exhibited an indifference to the consequences of his conduct." *Id.* (quoting *U.S. Auto Club,* 717 N.E.2d at 924) (internal quotations omitted).

A reasonable jury could find that Elfreich knew before releasing Axel that Axel was likely to bite and seriously injure the first person he saw, even if that person was neither armed nor attempting to resist or flee. Indeed, Elfreich has admitted as much. (Filing No. 81-7 at ECF pp. 10:2–16, 11:5–12; Filing No. 93-3 at ECF p. 5:20–25.) Applying common sense, a jury could find that Elfreich knew before grabbing Becker by the shirt collar and pulling him down the stairs—even though his hands were on his head and Axel was biting his leg—that Becker was likely to sustain some injury. And a sensible jury also could conclude that Elfreich knew that allowing Axel to continue to bite Becker's leg while he handcuffed Becker likely would result in serious injury.

A jury also could reasonably conclude that Elfreich reflected indifference toward the risks of substantial injury he recognized. I already have found that a jury reasonably could find that, despite knowing the damage Axel was likely to impose, Elfreich unleashed the dog without warning and with no particular reason to believe such heavyhanded force was necessary. Then, he applied additional force and refused to recall Axel even after Becker plainly surrendered and ceased to present any threat.

Because a jury could find that Elfreich acted willfully and wantonly, he is not entitled to immunity under the ITCA.

## B. The ITCA does not exempt officers or municipalities from liability for negligently imposed excessive force.

The Defendants next argue that the ITCA shields both Elfreich and the City from liability on Becker's negligence claims. Under the ITCA's "law enforcement immunity" provision, government entities and agents acting within the scope of their employment are immune to liability stemming from their efforts to enforce the law "unless the act of enforcement constitutes false arrest or false imprisonment." Ind. Code § 34-13-3-3(8)(A).

I do not read the Defendants' brief as arguing that the law enforcement immunity provision leaves them immune to Becker's battery claims. To eliminate any ambiguity, I note that the Indiana Supreme Court has held that this provision does not immunize municipalities or officers against excessive force claims. See *Wilson v. Isaacs*, 929 N.E.2d 200, 203–204 (Ind. 2010).

The Defendants continue to argue, however, that the law enforcement immunity provision applies to all acts of negligence—even those amounting to excessive force. The Court rejected this argument when the Defendants raised it in their first Motion for Judgment on the Pleadings. (*See* Filing No. 56 at ECF pp. 6–9.) The Defendants have presented no subsequently-issued authority on the issue, and I find no other reason to abandon that ruling. If Becker can convince a jury that the Defendants were negligent, the ITCA will allow him to recover.

### C. Because a reasonable jury could find Elfreich's conduct objectively unreasonable, the Defendants are not entitled to summary judgment on grounds of reasonableness.

Finally, the Defendants argue that they cannot be liable for battery or negligence because Elfreich's actions were "objectively reasonable, lawful and did not involve excessive force." (Filing No. 81 at ECF pp. 27–28.) In Indiana, a "law enforcement officer is justified in using reasonable force if the officer reasonably believes that the force is necessary to effect a lawful arrest." Ind. Code § 35-41-3-3(b). So an officer cannot be liable in tort for using force deemed objectively reasonable under the Fourth Amendment analysis detailed in Section III(A)(1) above. Brooks v. Anderson Police Dep't, 975 N.E.2d 395, 399 (Ind. Ct. App. 2012). Nor, the Defendants suggest, can an officer's employer be liable in the same circumstances.

Standing on the same Fourth Amendment reasonableness arguments they advanced against Becker's Section 1983 claims, the Defendants argue that they are entitled to summary judgment because no reasonable jury could conclude that Elfreich used unreasonable force.

Again, I disagree. A reasonable jury could find that each of Elfreich's three exertions of force was unreasonable. Consequently, he is not entitled to summary judgment on Becker's battery or negligence claims.

In sum, the Defendants have presented no reason that a reasonable jury could not decide Becker's state law claims in his favor. I therefore **DENY** the Defendants' motion as it applies to Counts I and III of the Amended Complaint.

## VI.  Conclusion

For the foregoing reasons, I **GRANT** the Defendants' motion in part and

**DENY** it in part.  I **GRANT** the motion to the extent I hold that:

- Becker may not hold Elfreich liable under Counts IV or VI of the Amended Complaint for unleashing Axel with instructions to bite and hold him;

- Becker may not hold the City liable under Count VI on the theory that deficiencies in SOP 359.00 caused injuries he sustained as a consequence of being bitten by Axel; and

- Becker may not hold the City liable under Count V for failing "to establish a policy that ensured the K-9 would not engage (bite) suspects if the suspect was not resisting, fleeing or endangering the safety of an officer or the public."

I **DENY** the motion in all other respects, leaving the following claims in

tact:

- Battery against Elfreich and the City (Count I).

- Negligence against Elfreich and the City (Count III).

- Fourth Amendment excessive force against Elfreich for yanking Becker down the stairs (Counts IV and VI).

- Fourth Amendment excessive force against Elfreich for allowing Axel to continue biting Becker after he had surrendered (Counts IV and VI).

- Fourth Amendment excessive force against the City for dog bite injuries owing to SOP 359.03's failure to require officers to remain in position to exercise complete control over their dogs (Count V).

- Fourth Amendment excessive force against the City for non-dog bite injuries owing to SOP 359.00's failure to explain when officers must terminate force (Count VI).

**SO ORDERED** this 26th day of January, 2015.

_____

WILLIAM G. HUSSMANN, JR.
Magistrate Judge

**Served electronically on all ECF-registered counsel of record.**